[Civ. No. 34991. First Dist., Div. Two. Jan. 20, 1976.]

CHARLES HENRY MORGENROTH, Plaintiff and Appellant, v.
PACIFIC MEDICAL CENTER, INC., et al.,
Defendants and Respondents.

COUNSEL

Gampell & Teter, Ralph J. Gampell and Edward L. Lascher for Plaintiff and Appellant.

Gudmundson, Siggins & Stone, W. W. Gudmundson, Hassard, Bonnington, Rogers & Huber, Robert D. Huber and Richard G. Logan for Defendants and Respondents.

## OPINION

**TAYLOR, P. J.**—Plaintiff, Charles Morgenroth, appeals from judgments of nonsuit entered at the close of the presentation of his evidence of liability in an action for malpractice against his doctors, A. Selzer, J. Sakai, W. Kerth and J. Kelly, and the Pacific Medical Center.[1] He contends that pursuant to the recently established rule of *Cobbs* v. *Grant,* 8 Cal.3d 229, 244 [104 Cal.Rptr. 505, 502 P.2d 1], he did not give an informed consent to the internal mammary visualization procedure that increased the risk of the stroke he suffered during the subsequent procedure of coronary arteriography, to which he consented. He also asserts that he adduced sufficient evidence to go to the jury on additional theories of liability. The case raises a question of proximate cause and whether a causal relationship existed between the physicians' failure to inform and the injury to Morgenroth, as well as a question of first impression as to whether the amount of additional information required

---

[1] All the parties agree that subsequently, a judgment of dismissal with prejudice was entered as to the Pacific Medical Center, but this judgment is not part of the record on appeal.

to be revealed is a matter for expert testimony, as the trial court ruled. For the reasons set forth below, we have concluded that the judgment must be affirmed.

Viewing the record in the light most advantageous to Morgenroth, the following pertinent chronology of events, adopted from his brief and the record, appears: In 1963, Morgenroth was 61 years old and retired from Lockheed, where he had been a cost control supervisor, and, with his wife of 31 years, moved to Berry Creek, a remote mountain area about 25 miles from Oroville. He then worked as a real estate developer, engaged in subdividing and selling a parcel of some 100 acres into approximately ½ acre lots. He acted as his own general contractor and also did the actual selling of the lots to customers.

At the time of his retirement from Lockheed, he had shortness of breath on exertion, a tightness in his chest at times and cramping in the calves of his legs. In late 1966 and early 1967, when these symptoms became worse, he was under the medical care of Dr. Frederick L. Evans of Chico, a specialist in internal medicine. Dr. Evens referred him for medical care to Dr. Selzer in San Francisco, an internal medicine specialist with a sub-specialty in cardio-vascular disease, with an office at the Pacific Medical Center. For the examination in connection with this referral, Morgenroth was admitted to the Pacific Medical Center on February 14, 1967. Dr. Selzer, testifying pursuant to Evidence Code section 776, indicated that Morgenroth's main complaints were of chest pain, provoked by any form of exercise or excitement (angina) and also cramps in the legs and groin on walking one block on the flat; this was caused by hardening of the arteries with resultant decrease in the blood flow to the heart muscle from the coronary arteries and the muscles of the legs. This decrease in the blood flow was the cause of the pain.

Among the tests that were performed on Morgenroth were an electrocardiogram which was abnormal and an electroencephelogram which was interpreted by different specialists to show very mild and certainly equivocal change, and also to be normal. A Masters test (an electrocardiogram taken during and immediately after the stress of walking up and down a few steps) was taken and Morgenroth went 23 steps as compared with the 20 minimum requirement. In addition, a cardiac catheterization was performed. In this procedure, a catheter is passed into a vein and then threaded through the veins to enter the right auricle of the heart and then into the right ventricle, so that various measurements are recorded. Dr. Selzer called into consultation Dr. Kerth, a cardiovascular surgeon who, after his examination, wrote a note

in the hospital record stating, in pertinent part: "Would favor doing an aortic arch study at time of coronary arteriogram if this is feasible."

The procedure of the coronary arteriogram entails the passing of a catheter into a hole in an artery and the tip of the catheter is guided up to the aortic arch and then into the orifice of a coronary artery, dye is injected and an X-ray moving picture is then taken. The catheter is then repositioned into the orifice of the other coronary artery and X-ray moving pictures are similarly taken. The procedure of an aortic arch study entails the passing of a catheter to the orifice of each of the brain vessels in turn and similar pictures taken. Although different kinds of catheters are used in each of these two procedures, both go through the same hole in the artery. If the amount of dye used for the coronary arteriogram, which has first priority, is too much, "it may not be safe for the patient to do at the same sitting the other study"; or if an inordinate amount of time is spent to visualize the coronary arteries, it is in the best interest of the patient to postpone the aortic arch study to a separate time.

Morgenroth was discharged from the Pacific Medical Center on February 21, 1967, and readmitted on February 26, 1967. The hospital record contains a "Consent to Operation" dated February 27, 1967, authorizing the performance of a selective coronary arteriography and aortic arch study. Both procedures were performed on February 28, 1967, with the incision in the artery being made through the right brachial artery, the artery in front of the elbow crease.

At the site of the incision into the brachial artery made for the passage of the catheters, a clot formed, a condition called a thrombosis of the brachial artery. An operation was required on the same day, in which the artery was opened and the clot removed. At the operation, it was found that the incision into the artery made for the insertion of the catheter for the procedures of coronary arteriogram and aortic arch studies had been made through a very large atheromatous plaque. Such a plaque is composed of a fatty substance that grows over with fibrous tissue and very often develops some calcium or lime salt in it.

Dr. Kerth, the consulting neurosurgeon at this operation, also examined pursuant to Evidence Code section 776, indicated that the finding of the plaque at the location of the incision into the artery made it likely that other fatty plaques would be present in other parts of the circulation. If, in fact, these fatty plaques are present in other parts of the circulation,

then one of the well recognized risks of doing a catheter procedure in the patient is the risk of knocking off one of the plaques. If a plaque is knocked off, it will be swept into the circulation and will eventually lodge in a place where the artery becomes too small for it; if this should be in the brain, then there is a probability of a stroke. Dr. Kerth, however, indicated that the tests involving these recognized hazards would not be performed in the first place unless the patient had arteriosclerosis.

The result of the first coronary arteriogram and aortic arch procedures showed that Morgenroth had a complete occlusion of his right coronary artery and a 50 percent narrowing of the main branch of the left coronary artery. The diagnostic procedures thus indicated that Morgenroth was in much worse condition than the doctors had previously realized and an urgent candidate for surgery. Dr. Selzer referred him to Dr. Kerth, who concurred. Thereafter, on March 6, 1967, Dr. Kerth performed a Double Vineberg operation on Morgenroth.[2] In this procedure, the internal mammary arteries on each side of the chest are cut open and introduced into the heart muscle, with the hope that the blood coming through the arteries will sprout into a new channel that will then connect with those that have inadequate blood supply.

Morgenroth was discharged from the hospital on March 20, 1967, and was seen at Dr. Selzer's office on April 24, 1967, by Dr. Kelly, Dr. Selzer's partner. Dr. Kelly made a note in his record at that time: "Rare attack of the angina now. Has arthritic discomfort of shoulder especially right shoulder. Advised regarding exercises." Morgenroth was seen again by Dr. Kelly at his office on July 20, 1967, and Dr. Kelly's note of that date indicates: "Doing well as far as the heart. No angina, but has clot indication of left leg. Sign of arterial insufficiency in the left leg. Seen with Dr. Kerth who agrees and wishes to enter for arteriographic studies and surgery."

Accordingly, Morgenroth was readmitted to the Presbyterian Hospital (a part of the Pacific Medical Center) on July 21, 1967, and discharged on July 22 after undergoing trans-lumbar aortogram. He was readmitted on July 25, 1967, underwent the diagnostic procedure of left femoral arteriography and was discharged on July 27. An evaluation of these procedures indicated that an operation for the condition in his legs was

---

[2]As to the Vineberg operation, Morgenroth was advised of the risks involved, including the risk of death that occurred in 4-5 percent of the cases.

not feasible and that there was no medical or surgical way of improving the poor blood supply in his legs.

After Morgenroth's discharge from the hospital following the performance of the Double Vineberg procedure, he went back under the care of Dr. Evans in Chico, who saw him on May 25, 1967. Dr. Evans' note indicated that he had had no chest pain since his prior visit on April 12, even though he had had a couple of temper tantrums. He was seen again by Dr. Evans on June 26, 1967, at which time Dr. Evans noted that Morgenroth complained of some intermittent cramping of his left leg and that he had difficulty in walking. The deposition of Dr. Evans, which was read into evidence, indicated that he had received a report from Dr. Kerth, dated August 10, 1967, stating: "He has no angina but his claudication has been quite limiting to him." Dr. Evans saw Morgenroth again on August 21, 1967, at which time he felt that the greatest problem was still the claudication, in that Morgenroth could not walk any distance without his legs cramping up. On February 6, 1968, Dr. Evans saw Morgenroth again and noted: "His legs are still his biggest disability. He cannot walk without claudication," and that he was quite free of chest pain. However, Morgenroth had had one bout of chest pain when the snow was about two feet deep in Paradise and he walked through it to feed the horses.

On March 6, 1968, Morgenroth received a letter from Dr. Sakai that led to the incident that is the subject of the instant action. At this time, Dr. Sakai was an employee of Drs. Selzer and Kelly and wrote the letter, set forth in full below,[3] with their knowledge and consent, as well as on their behalf. Morgenroth applied affirmatively and indicated there were "certain problems regarding circulation" that he had questions about. He was readmitted to the Presbyterian Hospital on April 9, 1968. A history taken on that date by an intern states, in part, "In March 1967 Vineberg, hospitalized for six weeks, discharged with nembutal and valium. In June '67 returned for femoral artery studies. Told that success with legs not good and decided not to do anything. Returns now for re-evaluation. No history of angina since Vineberg. No edema, shortness of breath, dyspnea on effort, or orthopnea or paroxysmal nocturnal dyspnea." Dr. Selzer testified that in this history there were no complaints referring to Morgenroth's heart, and that he assumed the leg complaints were the circulatory problems that Morgenroth had referred to in his letter to Dr. Sakai of March 13, 1968.

---

[3]"Dear Mr. Morgenroth: It has been a year now since you had your heart surgery at Presbyterian Hospital. Since the kind of operation you had is a relatively new procedure,

On April 10, Morgenroth was given an electrocardiogram and a vector cardiogram with results that proved to be unchanged from the cardiogram taken prior to the Vineberg operation. These results were an indication that the Vineberg operation had not been a success, a matter difficult to evaluate solely on the basis of Morgenroth's symptoms and complaints, because his leg condition precluded the necessary type of exertion.

On the morning of April 11, Morgenroth underwent the procedure of cardiac catheterization. For this procedure, he was taken to the Catheter Lab at 7:50 a.m. and was returned to the ward at 11:30 a.m. About 1:30 p.m. on the same day, Morgenroth was returned to the Catheter Lab for the purpose of undergoing the procedure of an internal mammary study and the procedure of coronary arteriography. For the internal mammary visualization, a catheter is passed into an artery in the right groin and threaded to the arch of the aorta. The tip of the catheter is positioned into the orifice of each internal mammary artery, dye is injected, a fluoroscopic examination is made and X-ray pictures taken. The catheters used for the internal mammary procedure are then taken out.

The internal mammary visualization procedure that took about one hour was carried out by Dr. Sakai. The films taken during this procedure were processed immediately and showed that the two arteries were blocked some four inches below their origin and that the Double Vineberg operation had proved to be a failure.

Thereafter, Dr. Sakai began the procedure of coronary arteriography. The purpose of this procedure was to visualize the right and left coronary arteries and a new catheter was inserted through the same hole that had been used for the internal mammary visualization. Shortly after the start of the coronary arteriography, and while the tip of the catheter was being repositioned in the orifice of the right coronary artery, Morgenroth had a serious stroke, becoming aphasic and hemiplegic. According to Dr. Kerth, the happening of the stroke was more probably a complication

---

we have been very interested in knowing how patients with this kind of operation are doing. You live at such a distance that we have not been able to see you as frequently as we would have liked. From previous experience we have learned that maximal benefit from this type of operation is usually accomplished in one year. We would like very much to see you now and evaluate your present status with studies, including arteriograms, especially if you might still have problems. We will take care of the hospitalization expense through our research funds, and in the event you cannot meet travel expenses we could make arrangements to cover this expense also. We would like to have you enter the hospital on Tuesday, April 9, for coronary arteriograms on April 11. Will you let us know if you can come at this time?"

from the internal mammary visualization procedure study than it was a coincidence. According to Dr. Selzer, a stroke was an unusual but possible and recognized risk of a coronary arteriography. At the time of trial, Morgenroth's residual brain damage was such that he was unable to testify; he required care in a nursing home.

The consent form for the procedures of the afternoon of April 11, signed by Morgenroth, states in part: "I authorize and direct Dr. Selzer/Kelly and staff, M.D. my surgeon and/or associates or assistants of his choice to perform upon me coronary arteriogram and/or to do any other therapeutic procedure that (his) (their) judgment may dictate to be advisable for the patient's well-being. The nature of the operation has been explained to me and no warranty or guarantee has been made as to the result or cure."[4]

Morgenroth conceded that all of the procedures were properly performed, but predicated the instant action on his failure to expressly consent to the internal mammary visualization procedure and the fact that he was not warned of the specific risk of a stroke in connection with the coronary arteriography performed on the afternoon of April 11. He concedes that Dr. Selzer advised him that the coronary arteriography procedure involved a risk of death or serious disease.

■ A nonsuit may be granted only where, disregarding conflicting evidence on behalf of defendants and giving to plaintiff's evidence all the value to which it is legally entitled, therein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff (*O'Keefe* v. *South End Rowing Club*, 64 Cal.2d 729, 733 [51 Cal.Rptr. 534, 414 P.2d 830, 16 A.L.R.3d 1]). Neither the appellate court nor the lower court may weigh the evidence or consider the credibility of the witnesses (*Lasry* v. *Lederman*, 147 Cal.App.2d 480 [305 P.2d 663]). Plaintiff may rely on that portion of testimony given under Code of Civil Procedure section 2055 (now Evid. Code, § 776) which is favorable to him, and disregard the unfavorable portions (*Anthony* v. *Hobbie*, 25 Cal.2d 814 [155 P.2d 826]). ■ However, the evidence produced by plaintiff must support a logical inference in his favor, sufficient to raise more than a mere conjecture or surmise that a fact is as alleged in order to warrant submission of the question to a jury and a court should not put itself in

---

[1]The words "Dr. Selzer/Kelly & staff" and "coronary arteriogram" are written. The remainder is printed.

the incongruous position of destroying logic to hold a case in court (*Reynolds* v. *Natural Gas Equipment, Inc.,* 184 Cal.App.2d 724, 731 [7 Cal.Rptr. 879]; *Gherna* v. *Ford Motor Co.,* 246 Cal.App.2d 639, 646-647 [55 Cal.Rptr. 94]).

The applicable law of disclosure required was recently set forth by our Supreme Court in *Cobbs* v. *Grant,* 8 Cal.3d 229, at pages 244 and 245 as follows: "The scope of the disclosure required of physicians defies simple definition. Some courts have spoken of 'full disclosure' (e.g., *Berkey* v. *Anderson, supra,* 1 Cal.App.3d 790, 804 [82 Cal.Rptr. 67]; *Salgo* v. *Leland Stanford etc. Bd. Trustees, supra,* 154 Cal.App.2d 560, 578 [317 P.2d 170]) and others refer to 'full and complete' disclosure (*Stafford* v. *Shultz* (1954) 42 Cal.2d 767, 777 [270 P.2d 1]; *Pashley* v. *Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 235 [153 P.2d 325]), but such facile expressions obscure common practicalities. Two qualifications to a requirement of 'full disclosure' need little explication. First, the patient's interest in information does not extend to a lengthy polysyllabic discourse on all possible complications. *A mini-course in medical science is not required; the patient is concerned with the risk of death or bodily harm, and problems of recuperation.* Second, there is no physician's duty to discuss the relatively minor risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence. When there is a common procedure a doctor must, of course, make such inquiries as are required to determine if for the particular patient the treatment under consideration is contra-indicated—for example, to determine if the patient has had adverse reactions to medication; but no warning beyond such inquiries is required as to the remote possibility of death or serious bodily harm.

 "However, when there is a more complicated procedure, as the surgery in the case before us, the jury should be instructed that *when a given procedure inherently involves a known risk of death or serious bodily harm, a medical doctor has a duty to disclose to his patient the potential of death or serious harm, and to explain in lay terms the complications that might possibly occur. Beyond the foregoing minimal disclosure, a doctor must also reveal to his patient such additional information as a skilled practitioner of good standing would provide under similar circumstances.*

"In sum, the patient's right of self-decision is the measure of the physician's duty to reveal. That right can be effectively exercised only if the patient possesses adequate information to enable an intelligent choice. The scope of the physician's communications to the patient, then,

must be measured by the patient's need, and that need is whatever information is material to the decision. Thus the test for determining whether a potential peril must be divulged is its materiality to the patient's decision. (*Canterbury* v. *Spence, supra,* 464 F.2d 772, 786.)

"We point out, for guidance on retrial, an additional problem which suggests itself. There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given. Here the record discloses no testimony that had plaintiff been informed of the risks of surgery he would not have consented to the operation. [Citations.]" (Italics supplied.)

 Under the above rules and circumstances of the instant case, we deem it advisable to turn first to the question of proximate cause. As the appeal is from a nonsuit, for the purpose of this discussion, we assume, therefore, that the internal mammary visualization was a procedure separate[5] from the coronary arteriography, and one to which Morgenroth had not expressly consented, as indicated by the written consent form in evidence.[6] Here, while there was evidence that it may not be safe to do a coronary arteriogram and aortic arch study at the same sitting, there was no such definitive evidence as to the internal mammary visualization and coronary arteriogram procedures.

The only evidence relating to causal connection is Dr. Kerth's highly conjectural and ambiguous testimony that in his opinion the stroke was *more* probably a complication from the internal mammary visualization procedure than a *coincidence,* and that the length of time diagnostic procedures go on is a factor that increases the risk of "something bad" happening. The question is whether this meets the test of proximate cause.

---

[5]Morgenroth predicates a substantial portion of his argument on the fact that during the prior coronary arteriography and aortic arch study, the consent form he signed specifically mentioned both procedures. The expert testimony of Dr. Kerth, however, indicates that in each instance, the procedures could be considered either separate or one, were often done together, and could also, under the particular circumstances, be considered as one procedure.

[6]There was evidence that the written consent form was merely a confirmation of Morgenroth's previous oral consent to a study to determine the success of the Vineberg operation, but for purposes of nonsuit, this evidence must also be disregarded.

We find persuasive on this issue the following discussion and standard from *Cooper* v. *Sisters of Charity of Cincinnati, Inc.,* 27 Ohio St.2d 242 [56 Ohio Ops.2d 146, 272 N.E.2d 97, at page 103], as set forth in the brief of respondents: "Traditional proximate cause standards require that the trier of the facts, at a minimum, must be provided with evidence that a result was more likely than not to have been caused by an act, in the absence of any intervening cause.

"Lesser standards of proof are understandably attractive in malpractice cases where physical well being, and life itself, are the subject of litigation. The strong intuitive sense of humanity tends to emotionally direct us toward a conclusion that in an action for wrongful death an injured person should be compensated for the loss of any chance for survival, regardless of its remoteness. However, we have trepidations that such a rule would be so loose that it would produce more injustice than justice. Even though there exists authority for a rule allowing recovery based upon proof of causation by evidence not meeting the standard of probability, we are not persuaded by their logic. [Citations.] The following authorities appear to require the establishment of proximate cause by evidence of probability: Harvey v. Silber (1942), 300 Mich. 510, 2 N.W.2d 483; Schuler v. Berger (1967), D.C., 275 F.Supp. 120; Walden v. Jones (Ky. 1969), 439 S.W.2d 571 (distinguishing Neal v. Walker, *supra*); Connellan v. Coffey (1936), 122 Conn. 136, 187 A. 901.

■ "We consider the better rule to be that in order to comport with the standard of proof of proximate cause, plaintiff in a malpractice case must prove that defendant's negligence, *in probability*, proximately caused the death." The authorities in this state are in accord that in a malpractice case, a mere possibility alone is not sufficient (*Johnston* v. *Brother*, 190 Cal.App.2d 464, 473 [12 Cal.Rptr. 23]; *Pacific Employers Ins. Co.* v. *Industrial Acc. Com.*, 182 Cal.App.2d 162, 165 [5 Cal.Rptr. 738]; cf. *Garza* v. *Workmen's Comp. App. Bd.*, 3 Cal.3d 312, 319 [90 Cal.Rptr. 355, 475 P.2d 451]). ■ We hold, therefore, that Dr. Kerth's testimony in the instant case is at best speculative and conjecture and falls short of meeting the "probability" standard of proximate cause.

■ Our inquiry, however, cannot end there as our Supreme Court in *Cobbs* v. *Grant, supra,* clearly indicated that there must also be a causal relationship between the physician's failure to inform and the injury to the patient. We turn, therefore, to the question of whether here, there

was a sufficient causal connection between the physicians' failure to inform Morgenroth of the risk of a stroke.

The necessary causal connection arises only if Morgenroth here adduced sufficient evidence from which a jury could conclude that if the revelation of the possible complication of the stroke had been specifically indicated, Morgenroth would not have consented to the coronary arteriogram during which the stroke occurred. It is uncontroverted that Dr. Selzer advised Morgenroth that the coronary arteriogram procedure carried the risk of death or serious disease. He did not advise Morgenroth about the possible complication of a stroke,[7] as he did not believe it to be in the best interest of his patients to detail every possible complication.

We think the information that a procedure carries the risk of death or serious disease in lay language sufficiently explains the range of complications that might occur, including a stroke. It cannot be overlooked here that Morgenroth was in a very serious condition as the 1967 diagnostic procedures indicated. As a result, he underwent the Vineberg operation. Although he had no further symptoms, this was not indicative of the success of the operation and a doctor cannot safely advise a patient in Morgenroth's condition only on the basis of changed symptoms alone. The results of the Vineberg operation could not be evaluated because Morgenroth's leg condition prevented the necessary exertion. The diagnostic procedures were the only feasible way to determine whether the collateral circulation had developed and also to ascertain Morgenroth's life expectancy.[8] Morgenroth was interested in this fact as he was an active person and dissatisfied with his physical limitations. We hold that Dr. Selzer's disclosure sufficiently met the materiality test of *Cobbs* v. *Grant, supra.* Here, likewise, there was no evidence that if Morgenroth had been informed in greater detail as to the possible consequences of a stroke that he would not have consented to the operation. The trial court also correctly ruled that as to whether the question of the "additional information as a skilled practitioner of good standing would provide under similar circumstances" was properly a

[7]Dr. Selzer also indicated that a stroke occurs in only one-half of one percent of cases, and a serious stroke of the type Morgenroth sustained, in even fewer instances. While this evidence would bring the risk within the exception we discussed in *Slater* v. *Kehoe,* 38 Cal.App.3d 819 [113 Cal.Rptr. 790], it must be disregarded for purposes of the nonsuit in the instant case.

[8]In view of this uncontroverted evidence, it is not necessary to discuss Morgenroth's contentions that the procedures were not conducted for his benefit.

matter for expert testimony. Morgenroth admittedly presented no such evidence, as he did not think it required by *Cobbs* v. *Grant, supra.* However, we do not see any other rational interpretation of the above quoted language from *Cobbs* v. *Grant, supra,* at page 245.

The judgments appealed from are affirmed.

Kane, J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 18, 1976. Wright, C. J., did not participate therein.