[Civ. No. 19296. Third Dist. June 16, 1981.]

JOHN H. McKINNEY, Plaintiff and Appellant, v.
LOUIS NASH et al., Defendants and Respondents.

COUNSEL

Maxim N. Bach for Plaintiff and Appellant.

Carlton, Borchard, Cowling & Fisher, Gary C. Borchard and William W. Coshow for Defendants and Respondents.

OPINION

YOUNG (S. C.), J.*—In an action for medical malpractice, plaintiff John McKinney† sought damages from defendants (surgeon Louis Nash and anesthesiologist William H. Moon) on theories of negligence in performing a surgical repair of a bilateral inguinal hernia, lack of informed consent before undertaking the surgery and breach of contract or warranty. At the conclusion of all the evidence, the trial court directed the jury to return a verdict on all theories in favor of defendants. Plaintiff now appeals from the judgment entered on that verdict.

 In considering whether there was error in granting of the directed verdict, we must view the evidence in a light most favorable to plaintiff. We must indulge in every legitimate inference which may be drawn from the evidence in plaintiff's favor and *disregard conflicting evidence* to determine whether there is evidence of sufficient substantiality to support a verdict for plaintiff. (*Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360]; *Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768].)

Plaintiff's evidence shows that he consulted Dr. Nash about an "enlarging" bulge in his right groin. After finding on physical examination that plaintiff suffered from a large right inguinal hernia and a small left inguinal hernia, Dr. Nash decided to perform surgery, i.e., a "bilateral hernioplasty." Dr. Moon was the anesthesiologist and determined that plaintiff should receive a spinal anesthetic.

Following the operation plaintiff suffered from permanent bilateral testicular atrophy, total sexual impotence and numbness in the pubic

---

*Assigned by the Chairperson of the Judicial Council.

†Wife Annabelle McKinney, also a plaintiff and appellant, is now deceased.

and groin area. Initially, he exhibited postoperative swelling in his right testicle for three months. Later, physical examination revealed that his right testicle measured one-fifth inch, or one-eighth of an adult male's normal size; and his left testicle measured one inch, or three-fourths of normal size. Before the surgery he suffered from none of these conditions.[1]

At trial, expert witnesses Drs. Sharlip (urologist) and Karam (endocrinologist) concluded that the cause of the testicular atrophy was the surgical procedure performed by Dr. Nash. Their opinion was that the surgery most likely caused vascular damage which resulted in the atrophied testicles. Dr. Nash also admitted that the postoperative swelling of plaintiff's testicle was consistent with vascular damage which could have caused the testicles to atrophy. Dr. Karam further testified to the effect that if vascular damage had occurred during the surgical procedure, and atrophy followed the surgery, it would indicate the surgeon had performed below the expected standard of care.

Dr. Nash testified some vascular as well as nerve damage is unavoidable in any hernia repair. He cited statistics indicating that resultant atrophy of one testicle occurs one-half of 1 percent of the time when due care is used, and atrophy of both testicles, one-tenth of 1 percent of the time.

Although there was extensive expert testimony that plaintiff's impotency was either of independent psychogenic or neurologic origin, Dr. Sharlip believed that the atrophied testicles could have been a psychological (but not physiological) contributing factor in causing the impotency.

Local numbness due to nerve damage sometimes occurs after surgical intervention to repair a hernia, but expert witnesses Drs. Sharlip, Raskin (neurologist) and Karam considered plaintiff's numbness too extensive to have been caused by Dr. Nash's surgical procedure. Instead, the numbness pattern indicated that the spinal anesthetic was the most likely cause. If such were the case, Dr. Raskin opined that the numbness would not be indicative of any lack of due care on the part of Dr. Moon; rather, it would suggest an unpredictable idiosyncratic patient

---

[1] There is some evidence that plaintiff's general practitioner administered testosterone and similar hormone injections for weakness and "hot flashes" during a period prior to surgery.

reaction. As conceded by Dr. Moon, there also was expert evidence that neurological damage due to the spinal anesthetic could have been associated with plaintiff's impotence. However, no credible evidence linked the spinal anesthetic as a contributing cause of the testicular atrophy.

Although plaintiff had no understanding of how a bilateral inguinal hernia operation is conducted or how a spinal anesthetic works, neither Dr. Nash nor Dr. Moon informed him of any risks of the surgery. Although Dr. Nash usually tells his patients that there may be temporary swelling and an area of numbness after a hernia operation, Dr. Nash told plaintiff only that it was a simple operation and that there would be no problem. Plaintiff testified had he been informed of the possibility of bleeding and testicular atrophy following a hernia operation or apprised of the possibility of losing sensation in his sexual organs, he would not have consented to the operation.

I

■ Arguing that the doctrine of res ipsa loquitur applies, plaintiff contends on appeal that there was substantial evidence to support a verdict in his favor that his injuries were caused by the negligent medical treatment of Drs. Nash and Moon.

■ "It is settled law in this state that the 'doctrine of res ipsa loquitur is applicable where the [injury] is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the one responsible. [Citations.]' [Citation.] According to the classic and oft-repeated statement, there are three conditions for the application of the doctrine: "'(1) the [injury] must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.'" [Citations.] The existence of one or more of these conditions is usually a question of fact for the jury. [Citations.]" (*Newing* v. *Cheatham* (1975) 15 Cal.3d 351, 359 [124 Cal.Rptr. 193, 540 P.2d 33]; see also Evid. Code, § 646, and Law Revision Com. comment thereto.)

■ "... Since the res ipsa loquitur instruction permits the jury to infer negligence from the happening of the [injury] alone, there must be a basis either in common experience or expert testimony that when such

an [injury] occurs, it is more probably than not the result of negligence. [Citations.]" (*Tomei* v. *Henning* (1967) 67 Cal.2d 319, 322 [62 Cal. Rptr. 9, 431 P.2d 633]; see also Evid. Code, § 646.) The record here reveals that the medical procedures employed by Drs. Nash and Moon, e.g., a bilateral inguinal hernia repair using a spinal anesthetic, were of sufficient complexity to be outside the realm of common experience and appreciation. Thus, the question of whether the injuries in this case were probably the result of negligence was a matter requiring expert testimony. (See *Tomei* at p. 322; *Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 789-793 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 236-237 [104 Cal.Rptr. 505, 502 P.2d 1].)

## *The Question of Dr. Nash's Negligence*

Dr. Karam's testimony was admitted into evidence through his deposition. He was plaintiff's witness. His pertinent testimony is as follows:

"Q. What findings did you determine after this examination?

"A. I did determine that he did have subnormal size of both his testicles. They were atrophic and that the sensations around the skin and the genital areas were diminished. He did not feel pain sensations, pinprick.

"․ . . . . . . . . . . . . .

"Q. Did you reach any conclusions or impressions as to what caused the problems that you just described in your findings?

"A. I reached the conclusion that there was definite abnormal shrinking of the testicles in this patient and that I also reached the conclusion that his history of not having sexual intercourse could be explained by the fact that he had neurological deficits. He did not have normal nerve supply to the genital area; and ....

"Q. Were you able to determine an etiology for this?

"A. I'm sorry.

"Q. Were you able to determine the cause of this?

"A. From the history it was quite suggestive that this seemed to develop following a surgical procedure for an inguinal hernia, and I felt that there must have been some kind of postsurgical vascular damage that accounted for the shrinking of the testicles and impaired nervous system supply. That was the impression I had.

"Q. What type of postsurgical vascular damage would you be speaking of that would cause this result?

"A. I would suggest that possibly there was ischemia or damage to the blood supply to the testicle or to the nerve supply to the testicle, that there could have been some reason for the testicle to undergo atrophy. The testicle depends for its nourishment on a continuous blood supply, and that I felt that—it possible that something had impaired the blood supply and the nerve supply could have damaged the testicle and resulted in the neurological deficit of not being able to go through an ejaculation or erection.

"Q. What is your opinion or what do you base your opinion that this is postsurgical as opposed to being presurgical or—

"A. I've never seen this occur spontaneously to this degree, and the patient gave a history that in [a] certain period of time he didn't have this problem until after surgical operation; so I was reasoning on that basis, that the surgical procedure occurred at the time that this began to develop and the surgical procedure was in the area that might have caused a damage to a blood vessel of that area.

". . . . . . . . . . . . . .

"Q. Now you indicated a postoperative vascular damage. This is not something that you would expect in any normal surgical procedure of this type, is it?

"A. I wouldn't expect it in a normal surgical procedure of this type. It's not an expected complication.

"Q. So would it be fair to say then that this postvascular damage would be brought about by, say, negligence or [sic] the surgeon involved falling below the standard of due care of a surgeon of his specialty?

"A. I'd have to say it would not be expected to occur, and if this did occur I guess it would be below the expectations of standardization of surgical procedure.

"I might have to say then the word 'vascular damage' seems to be stressed, and I can't be sure that nerve damage would not also do it. I feel some kind of atrophic damage whether its nerve or blood vessel is responsible .... I don't have enough expertise in this matter to be sure of the etiology.

"I do feel, though, that surgical procedures in some way seem to be incriminated in the resulting damage, and I have no other spontaneous reason to explain it by."

Obviously, this testimony is not unequivocal which perhaps influenced the trial court judge in his decision to grant a directed verdict.

 However, Dr. Karam's testimony is not the only evidence which supports this court's opinion that the jury should have been left to decide whether or not Nash's operation fell below the standard of care necessary.

In addition to Karam's testimony, which incidentally was not in any way impaired by any cross-examination of defendants' attorneys, Dr. Nash himself testified as follows:

"Q. If due care is used in a bilateral inguinal hernia operation would you expect to have a result where one testicle atrophied?

"A. Would you expect it? I would expect it in a certain percentage of the time, yes.

"Q. And what percentage is that?

"A. In my experience atrophy of the testicle occurs about half of one percet [sic]. This is National statistics also.

"Q. Would you expect with due care being used in a bilateral inguinal hernia operation atrophy occurring as a result of that operation to both testicles?

"A. I don't think I understand your question.

"Q. All right. I will rephrase it. If due care is used in a bilateral inguinal hernia operation would you expect a result of both testicles atrophying?

"A. In less than one-tenth of one percent, National statistics."

Although this testimony was elicited on cross-examination and plaintiff's counsel appeared to dilute the testimony, there are inferences that can be drawn from that testimony other than the inference that no negligence was involved in the performance of this operation. The very rarity of this result, particularly of the atrophy of both testicles subnormally, could lead the jury to the inference that there *was* a lack of due care in the performance of this operation. The jury is not required to accept the inference which Dr. Nash wishes to place on this testimony that these things can happen even with due care. The jury could infer that the result was the result of a lack of due care.

In addition to the testimony of Dr. Nash there is the simple fact that this plaintiff went on the operating table, with apparently normal testicles, and postsurgically suffered a significant atrophy of both testicles. In fact, the testimony indicates that one testicle was one-fifth the size of a normal testicle. Certainly that evidence itself, together with the testimony of Dr. Karam, should present a jury question. (*Tomei v. Henning, supra*, 67 Cal.2d at pp. 322-323.)

Rarity itself was discussed in *Quintal v. Laurel Grove Hospital* (1964) 62 Cal.2d 154, 164 [41 Cal.Rptr. 577, 397 P.2d 161], where it was stated: "... Here we have an injury which is very rare. It is an injury that could result from negligence, or could result without negligence. Is it more probable than not that it was a result of negligence? That is the question. The plaintiffs, out of the mouths of the defendants and their witnesses, proved that the injury could occur as a result of negligence. There is also evidence that the injury could occur without negligence. In such circumstances the jury should be instructed that if they find certain facts to be true they should apply the inference involved in res ipsa. Here we have an injury that is a *known risk* and rarely occurs. We have the instrumentality in the procedures involved completely in the control of the defendant doctors."

In addition, there was substantial evidence to support that the testicular atrophy, probably caused by the vascular damage, could be traced to the surgical procedures under Dr. Nash's control. Expert witness Dr.

Sharlip specifically testified that the "surgery was the event which caused the atrophy." Finally, Dr. Nash did not present any evidence to rebut the presumption of Evidence Code section 646 that the occurrence of the atrophy was not due to any voluntary action or contribution on the part of plaintiff.

### The Question of Dr. Moon's Negligence

■ The result is different with respect to Dr. Moon. There is little, if any, evidence to support a theory that plaintiff's testicular atrophy resulted from any neurological damage due to administration of the spinal anesthetic. As indicated by all the experts, vascular damage was the likely cause of the atrophy. Consequently, the atrophy was, as a matter of law, not caused by an agency or instrumentality in the exclusive control of Dr. Moon. And although there was ample testimony that the spinal anesthetic was the probable cause of plaintiff's complaint of numbness, Dr. Raskin testified that such neurological defect would *not* be consistent with a lack of due care. As his testimony was the only expert testimony on the applicable standard of care for an anesthesiologist, there was insufficient evidence to meet the requisite first condition of res ipsa loquitur on the probability of someone's negligence in administering the anesthetic.

### II

■ Next, plaintiff claims he presented substantial evidence of lack of informed consent to preclude a directed verdict in favor of either defendant. We agree only with respect to Dr. Nash.

■ A physician has a duty to inform a patient in lay terms of the dangers inherently and potentially involved in a proposed treatment. (*Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 243.) "The scope of a physician's duty to disclose is measured by the amount of knowledge a patient needs in order to make an informed choice. All information material to the patient's decision should be given. (*Id.,* [*Cobbs*] at p. 245.)

"Material information is that which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject the recommended medical procedure. [Citations.] To be material, a fact must also be one which is not commonly appreciated. [Citation.] If the physician knows or should know of a patient's unique concerns or lack of familiarity

with medical procedures, this may expand the scope of required disclosure. [Citation.]" (*Truman* v. *Thomas* (1980) 27 Cal.3d 285, 291 [165 Cal.Rptr. 308, 611 P.2d 902].)

Obviously involved in the equation of materiality are countervailing factors of the seriousness and remoteness of the dangers involved in the medical procedure as well as the risks of a decision not to undergo the procedure. (See *id.*, at pp. 292-293.) For complicated medical procedures, the *Cobbs* court has stated that the doctor should disclose to the patient the potential for death or serious bodily harm. Beyond such minimal disclosure, a doctor must supply the patient with "such additional information as a skilled practitioner of good standing would provide under similar circumstances." (8 Cal.3d at pp. 244-245.) As such additional information requires expert testimony (*Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 534-535 [126 Cal.Rptr. 681]) not present in the record of this case, we need only consider whether the doctors here met the minimal disclosure requirement.

*Dr. Nash*

The evidence shows that plaintiff suffers from well-known risks of a hernia operation. Dr. Nash himself testified that, following a bilateral inguinal hernia repair, swelling due to bleeding occurs in about 4 to 5 percent of the patients and that bilateral testicular atrophy can be expected in one-tenth of 1 percent of the patients. Yet, according to plaintiff's evidence, Dr. Nash did not inform him of any of these risks. Plaintiff also testified that he would have declined surgery if Dr. Nash had informed him of such perils of hernioplasty. (See *Cobbs* v. *Grant, supra*, 8 Cal.3d at p. 245.)

The low incidence of testicular atrophy weighs against materiality. The seriousness of testicular atrophy is debatable as well. Yet we cannot say, as a matter of law, that a jury reasonably could find that knowledge of this risk was not material to plaintiff's decision. (See *Truman* v. *Thomas, supra*, 27 Cal.3d at p. 293.) Particularly since expert witness Dr. Sharlip testified that plaintiff's atrophied testicles could have contributed psychologically to the more serious consequence of impotency, we deem the question of whether Dr. Nash failed to obtain plaintiff's informed consent a proper question for the jury. Plaintiff did have a nonsurgical option of cushioning the bulges in his groin.

*Dr. Moon*

■ The result is again different with respect to Dr. Moon. We conclude that the anesthesiologist's failure to warn plaintiff of the risks in administering a spinal anesthetic was not material as a matter of law.

Plaintiff relies on the testimony of Dr. Moon to the effect that there is a known risk that a spinal anesthetic solution may be contaminated and cause neurological damage of the type suffered by plaintiff. However, the expert testimony of Dr. Raskin established that the possibility of a contaminated solution is no longer a current risk of spinal anesthesia. The alternative possible cause of plaintiff's neurological damage was an extremely rare idiosnycratic reaction to the anesthetic. Neither was a material risk.

### III

Finally, plaintiff claims there was substantial evidence that both Dr. Nash and Dr. Moon breached a warranty or contract in performing the surgery. This claim has no merit.

■ To recover for breach of warranty or contract in a medical malpractice case, there must be proof of an express contract by which the physician clearly promises a particular result and the patient consents to treatment in reliance on that promise. (*Depenbrok v. Kaiser Foundation Health Plan, Inc.* (1978) 79 Cal.App.3d 167, 171 [144 Cal.Rptr. 724]; *Jamison v. Lindsay* (1980) 108 Cal.App.3d 223, 234 [166 Cal. Rptr. 443].) The promise of a particular result is to be distinguished from the mere generalized statement that the result of treatment will be good. (*Depenbrok, supra*, at p. 171.)

Dr. Nash's comment to plaintiff that the hernia operation would be simple and without problem does not satisfy such standard of particularity. The comment could not be the basis of any express contract.

It necessarily follows that Dr. Moon likewise did not breach any contract with plaintiff. Plaintiff cannot *imply* a contract from Dr. Moon's failure to explain anything at all about the spinal anesthetic since the law requires an *express* contract. A doctor is not a guarantor of a certain result. (*Cobbs v. Grant, supra*, 8 Cal.3d at p. 238.)

The judgment as to defendant Nash is reversed. The judgment as to defendant Moon is affirmed. The cause is remanded for further trial court proceedings consistent with this opinion. Plaintiff is to recover costs on appeal from defendant Nash. Defendant Moon shall bear his own costs on appeal.

Puglia, P. J., and Evans, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 19, 1981.