**Patty Jo CULBERTSON and Jack Culbertson, Appellants,**
**(Plaintiffs Below)**

v.

**Dr. Roland B. MERNITZ, Appellee.**
**(Defendant Below)**

No. 25S03–9210–CV–876.

Supreme Court of Indiana.

Oct. 29, 1992.

Patrick M. O'Brien, Alastair J. Warr, Steers Sullivan McNamar & Rogers, Indianapolis, for appellants.

Mark W. Baeverstad, Hunt Suedhoff Borror & Eilbacher, Fort Wayne, for appellee.

ON PETITION TO TRANSFER

KRAHULIK, Justice.

Roland B. Mernitz, M.D., (Appellee–Defendant) seeks transfer from the Court of Appeals' reversal of a summary judgment entered in his favor. *Culbertson v. Mernitz* (1992), Ind.App., 591 N.E.2d 1040. The issue squarely presented in this petition is whether expert medical testimony is required to establish the standard of care of health care providers on the issue of informed consent. Because this Court has not previously written on this subject, we accept transfer.

The facts of the case are as follows. Dr. Mernitz first saw Patty Jo Culbertson on March 28, 1988. Her chief complaint was that of uncontrollable leakage of urine and discharge from the vagina. After performing a physical examination, Dr. Mernitz determined that she was suffering from urinary stress incontinence due to a mild cystocele, which is a bulging of the bladder into the vagina. Additionally, he determined that she had cervicitis, which was causing the vaginal discharge. Thirdly, he found that she had multiple fibroid tumors

of the uterus. His recommendation was that she should undergo a surgical procedure known as a MMK procedure[1] in order to suspend the bladder and either a hysterectomy or cryosurgery to freeze the infected tip of the cervix. Dr. Mernitz contends that he advised her of the general risks of any surgery, viz. infection, bleeding, and death, and that, with respect to the bladder suspension, he explained to her the risk that the procedure could fail and the possibility that she would be unable to void. Additionally, with respect to the cryosurgery he contends he told her that she would have severe vaginal discharge for two weeks and a milder discharge for six weeks thereafter. Mrs. Culbertson, on the other hand, denies that any of these risks were explained to her. Both parties, however, agree that Dr. Mernitz did not advise her of a risk that the cervix could become adhered to the wall of the vagina.

Following this office visit, Mrs. Culbertson decided to proceed with the bladder suspension and cryosurgery. She was admitted to the hospital and underwent these procedures. Post-surgically, Mrs. Culbertson's cervix adhered to the wall of her vagina. Dr. Mernitz prescribed medication for this condition, but Mrs. Culbertson became dissatisfied with his care and saw another surgeon who eventually performed a total abdominal hysterectomy, bilateral salpingo-oophorectomy which involves the removal of both ovaries, and another bladder suspension.

Following this surgery, Mr. and Mrs. Culbertson filed a proposed complaint against Dr. Mernitz with the Indiana Department of Insurance in four counts. Count I alleged that the adherence of the cervix to the vagina was caused by negligent cautery of the cervix. Count II alleged that Dr. Mernitz failed to inform Mrs. Culbertson of the alternatives to surgery and the inherent risks and complications of surgery. Count III alleged that Dr. Mernitz refused to treat and abandoned Mrs. Culbertson. And Count IV alleged a claim for loss of consortium by Mr. Culbertson.

A medical review panel was convened and, after submission of evidence to it, issued its written opinion. On Count I the panel unanimously found that there was no evidence to support the allegation that the surgery had been negligently performed. Similarly, it found no evidence to support the allegation in Count III that Dr. Mernitz had abandoned Mrs. Culbertson. With respect to the informed consent issue alleged in Count II, the panel ruled:

> The Panel determines that [Dr. Mernitz] did not advise [Mrs. Culbertson] of the complication of cervical adhesion to the vagina; the Panel further determines that such non-disclosure does not constitute a failure to comply with the appropriate standard of care, as such complication is not considered a risk of such surgery requiring disclosure to the patient.

The Culbertsons filed their civil action in a complaint that mirrored the allegations of the proposed complaint. After answering this complaint, Dr. Mernitz moved for summary judgment relying on the expert opinion issued by the medical review panel. The Culbertsons did not file an affidavit or other evidence in opposition to the motion for summary judgment, but argued to the trial court that the "prudent patient" standard should be utilized in evaluating informed consent claims. The trial court entered summary judgment on all four counts. The Culbertsons appealed to the Court of Appeals on the informed consent issue and argued that expert medical testimony is not necessary to make a *prima facie* case of lack of informed consent because the "prudent patient" standard is the law in this State and such standard does not contemplate the necessity of expert medical testimony.

The Court of Appeals agreed with the Culbertsons that the trial court had erroneously entered summary judgment on Counts II and IV because an issue of fact remained as to whether the risk of cervical adhesion to the vagina was a "material risk". 591 N.E.2d at 1042. The court further held that that issue was a question for

---

1. Marshall Marchetti Krantz procedure.

the jury which does not require expert testimony as to materiality, although expert testimony might be required to establish the existence and extent of the risk. *Id.* Judge Hoffman disagreed and filed a dissenting opinion in which he set forth his belief that a physician must disclose those risks which a reasonably prudent physician would disclose under the circumstances. *Id.* at 1043. He further reasoned that the situation in the instant case was clearly outside the realm of a layperson's comprehension, and that expert testimony was required to establish whether the disclosure was reasonable. He concluded that Culbertson's failure to present any expert testimony contrary to the panel's express findings on this issue made entry of summary judgment in favor of Dr. Mernitz proper. Because of the divergence of opinions in the Court of Appeals on this precise issue, we must determine the role, if any, played by expert medical opinion in resolving claims of medical malpractice premised upon a failure to obtain an informed consent.

The courts, historically, have established the standard of care required of physicians when treating patients. The law requires that a physician treating a patient possess and exercise that degree of skill and care ordinarily possessed and exercised by a physician treating such maladies in the same or similar locality. *Worster v. Caylor* (1953), 231 Ind. 625, 110 N.E.2d 337 (overruled on other grounds).[2] In order for a lay jury to know whether a physician complied with the legally prescribed standard of care, expert testimony has generally been held to be required. *Id.*, 231 Ind. at 630, 110 N.E.2d at 340. This requirement was premised on the logical belief that a non-physician could not know what a reasonably prudent physician would or would not have done under the circumstances of any given case. Therefore, an expert familiar with the practice of medicine needed to establish what a reasonably prudent physician would or would not have done in treating a patient in order to set before the

jury a depiction of the reasonably prudent physician against which to judge the actions of the defendant physician. An exception was created in cases of *res ipsa loquitur* on the premise that in such cases a lay jury did not need guidance from a physician familiar with medical practice as to what was required of a reasonably prudent physician because the deficiency of practice "spoke for itself." *Kranda v. Houser–Norborg Med. Corp.* (1981), Ind. App., 419 N.E.2d 1024, 1042. This was the settled law of most American jurisdictions, including Indiana, prior to the early 1970's when two cases on the opposite coasts carved out an additional exception to the requirement of expert medical testimony in the area of "informed consent".

In *Cobbs v. Grant* (1972), 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1, the California Supreme Court held that expert testimony is not required to establish a physician's duty to disclose risks of a proposed treatment. The premise of this opinion was that placing unlimited discretion in the medical community to determine what risks to disclose was irreconcilable with the basic right of a patient to make the ultimate informed decision regarding a course of treatment. The court reasoned that a physician is in the best position to appreciate the risks inherent in the proposed procedure, the risks inherent in deciding not to undergo the proposed procedure, as well as the chances of a successful outcome. The court held that once this information had been disclosed, however, the expert function of the physician had been performed and the decisional task of weighing the positive benefits of the proposed procedure against the negative possibilities inherent in the procedure passed solely and exclusively to the patient. Finally, the court opined that a jury is in the best position to determine whether the physician gave the patient the information needed by the patient to weigh the alternatives and make the ultimate decision of whether to proceed with the proposed treatment.

**2.** Most recently, in *Vergara v. Doan* (1992), Ind., 593 N.E.2d 185, 187, this Court shortened the definition of the standard to be that of a reasonably careful, skillful and prudent practitioner acting under the same or similar circumstances.

In the same year, the Court of Appeals for the District of Columbia decided *Canterbury v. Spence* (1972), 464 F.2d 772, *cert. den.*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518. In *Canterbury*, the court also held that expert testimony was not required to establish a physician's duty to disclose risks of a proposed treatment. It reasoned that while an expert may be required to identify for the jury the risks of the proposed treatment and the risks of non-treatment, a jury did not need expert guidance on whether a particular risk was material to a patient's ultimate decision. The court held that "a risk is thus material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy." 464 F.2d at 787. With that as the standard of care in informed consent cases, the court concluded that a lay jury was in as good a position as a physician to determine whether the physician had informed the patient of the facts such a patient would "need to know" in order to arrive at a decision.

This view has been adopted in approximately ten jurisdictions, while the traditional view that expert medical testimony is necessary to inform the jury of what a reasonably prudent physician would disclose remains the law in approximately 25 jurisdictions. *See* Daniel E. Fields, Annotation, *Necessity and Sufficiency of Expert Evidence to Establish Existence and Extent of Physician's Duty to Inform Patient of Risks of Proposed Treatment*, 52 A.L.R.3d 1084 (1973 & Supp.1991).

### Informed Consent in Indiana Jurisprudence

■ In the first reported Indiana case to discuss the doctrine of informed consent, the Court of Appeals declined to determine either the extent of a physician's duty to disclose or the exceptions to such duty, because that determination was not necessary to the resolution of the case at hand. *Joy v. Chau* (1978), 177 Ind.App. 29, 377 N.E.2d 670. The *Joy* court, however, did hold:

It is clear that Indiana must recognize the duty of a physician to make a reasonable disclosure of material facts relevant to the decision which the patient is requested to make. The duty arises from the relationship between the doctor and patient, and is imposed as a matter of law as are most legal duties.

177 Ind.App. at 39, 377 N.E.2d at 676–77 (citations omitted). This discussion of informed consent was next taken up and directly decided in *Revord v. Russell* (1980), Ind.App., 401 N.E.2d 763. In *Revord*, the Court of Appeals affirmed the trial court's granting of a motion for judgment on the evidence in favor of Dr. Russell over the plaintiff's assertion that an issue of fact requiring a jury's resolution existed, even though no expert medical testimony had been presented. In discussing this issue, the *Revord* court quoted from both *Cobbs*, 104 Cal.Rptr. 505, 502 P.2d 1, and *Canterbury*, 464 F.2d 772, as well as from 52 A.L.R.3d 1084. The court specifically held, however, as follows:

In the instant case, the Revords offered no expert medical testimony, and laymen would have no way of determining whether under the circumstances Mary Revord's parents had sufficient information to allow them to make an intelligent decision. Brain surgery is not a matter within the common knowledge or experience of laymen, and we hold that medical testimony was required of the Revords to establish a prima facie case under their informed consent theory. No expert medical evidence was offered by the Revords that a reasonable neurosurgeon, in the same or similar circumstances, would have told them of the risk of injury suffered here or that the disclosures made by Russell did not meet the standard of what a reasonable neurosurgeon would have disclosed under the same or similar circumstances. Thus the trial court properly granted a directed verdict in Russell's favor.

401 N.E.2d at 767 (citations and footnote omitted). It is clear from the above-quoted holding that the *Revord* court, although recognizing the discussion of *Cobbs* and

*Canterbury,* continued to hold the view that expert medical testimony was necessary to prove a *prima facie* case of medical malpractice under the informed consent doctrine.

This view was continued in *Searcy v. Manganhas* (1981), Ind.App., 415 N.E.2d 142. In affirming the trial court's entry of judgment on the evidence, the *Searcy* court cited *Revord* and held that judgment on the evidence was appropriate because the plaintiff patient had offered no expert medical testimony to establish what risks the defendant physicians had a duty to disclose. Therefore, the *Searcy* court held that the patient's evidence lacked at least one essential element necessary to establish a *prima facie* case and the trial court properly granted the motion for judgment on the evidence in the physician's favor. *Id.* at 145. This same rule of law was restated in *Ellis v. Smith* (1988), Ind.App., 528 N.E.2d 826, where the Court of Appeals upheld the entry of summary judgment in favor of a physician. In so doing, the court reiterated its previous holdings:

> The general rule is that expert medical opinion testimony is required to establish the content of "reasonable disclosure" unless the situation is clearly within the realm of laymen's comprehension, as where disclosure is so obvious that laymen could recognize the necessity of such disclosure.
>
> In the present case, the reasonable disclosure and informed consent necessary for elective foot surgery on a muscular dystrophy patient is not clearly within a layman's realm of comprehension. Plaintiffs were required to come forward with expert medical opinion contrary to the unanimous finding of the medical review panel. The question of an appropriate standard of care may not be resolved without resort to expert testimony.

528 N.E.2d at 828 (citations omitted).

This rule was followed in *Payne v. Marion General Hospital* (1990), Ind.App., 549 N.E.2d 1043, where the Court of Appeals reversed a summary judgment entered in favor of the physicians in a case involving the physician's order to not resuscitate, or "no code", a patient without discussing the matter with the patient. The *Payne* court held that the situation involved in that case was within the realm of the ordinary layman's comprehension. *Id.* at 1050. The court specifically held that a jury would not be called upon to weigh a disclosure to determine if it met the requisite standard of care as is typically the case undertaken by the jury in informed consent cases. *Id.* The court held that this was true because in the case at bar, no disclosure whatsoever had been made and no effort had been undertaken by the physician to determine if the patient was competent prior to entering the "no code" order over the telephone. *Id.* The court continued, however, to follow the general rule: "As a general rule, expert medical testimony is required to establish whether the disclosure by the physician is reasonable. However, if the situation is clearly within the realm of laymen's comprehension, expert medical testimony is not required. *Ellis, supra; Searcy, supra; Revord, supra.*" *Id.*

The Culbertsons urge that the Indiana Court of Appeals arguably adopted the "prudent patient" standard of care as discussed in *Canterbury* in the case of *Spencer v. Christiansen* (1990), Ind.App., 549 N.E.2d 1090. They are mistaken. The *Spencer* court, in a one paragraph review of the general law, stated that Indiana recognized the duty of a physician to "make a reasonable disclosure of material facts relevant to the decision which the patient is requested to make" and that, as a general rule, "expert medical testimony is required to establish the content of the 'reasonable disclosure'." *Id.* at 1091. The court, however, then continued and stated that "whether the required disclosure occurred and its adequacy is an issue of fact that does not require medical expertise; accordingly medical expert opinion on the jury issue is inappropriate." *Id.* As was recently recognized in *Dickey v. Long* (1992), Ind., 591 N.E.2d 1010, much of the language contained in *Spencer* was merely *dicta* because the specific holding in *Spencer* was that a medical review panel had not resolved a disputed fact and, consequently, the issue of whether that case

required expert medical opinion was not decided. *Spencer* is not, therefore, support for the proposition advocated by the Culbertsons.

Finally, in *Griffith v. Jones* (1991), Ind. App., 577 N.E.2d 258, the Court of Appeals for the first time departed from its previous holdings and concluded that "the weight of authority supports the trial court's determination that the prudent patient standard of care in informed consent cases, as articulated in *Canterbury, supra,* has been adopted in Indiana." *Id.* at 264. Simply stated, our reading of the prior cases, as set forth above, does not support this statement and, to the contrary, leads us to conclude that expert medical testimony is necessary to establish whether a physician's disclosure of risks comports with what a reasonably prudent physician would have disclosed. Because the court in the case at issue here relied on its previous holding in *Griffith* to reverse the summary judgment entered in favor of Dr. Mernitz, it erred. We hold that pursuant to the precedent discussed above, the trial court properly entered summary judgment in favor of Dr. Mernitz.

Resolution of the issue of the necessity of expert medical testimony in informed consent cases depends on whether the issue is viewed through the eyes of the physician or the patient. When viewed through the eyes of the physician, it is easy to see that a physician should not be required to guess or speculate as to what a hypothetical "reasonably prudent patient" would "need to know" in order to make a determination. A physician should only be required to do that which he is trained to do, namely, conduct himself as a reasonably prudent physician in taking a history, performing a physical examination, ordering appropriate tests, reaching a diagnosis, prescribing a course of treatment, and in discussing with the patient the medical facts of the proposed procedure, including the risks inherent in either accepting or rejecting the proposed course of treatment. From a physician's viewpoint, he should not be called upon to be a "mind reader" with the ability to peer into the brain of a prudent patient to determine what such patient "needs to know," but should simply be called upon to discuss medical facts and recommendations with the patient as a reasonably prudent physician would.

On the other hand, from the patient's viewpoint, the physician should be required to give the patient sufficient information to enable the patient to reasonably exercise the patient's right of self-decision in a knowledgeable manner. Viewed from this vantage point, the patient does not want the medical profession to determine in a paternalistic manner what the patient should or should not be told concerning the course of treatment. Thus, such a patient would view the reasonably prudent physician standard as destroying the patient's right of self-decision and, impliedly, placing such decision under the exclusive domain of the medical profession. While this viewpoint may or may not have been justified in 1972 when *Canterbury,* and *Cobbs,* were decided, a review of medical ethics standards of care in 1992 should assuage this fear.

The 1992 Code of Medical Ethics, as prepared by the Council on Ethical and Judicial Affairs of the American Medical Association, sets forth the medical profession's standard on informed consent. It reads as follows:

The patient's right of self-decision can be effectively exercised only if the patient possesses enough information to enable an intelligent choice. The patient should make his own determination on treatment. The physician's obligation is to present the medical facts accurately to the patient or to the individual responsible for his care and to make recommendations for management in accordance with good medical practice. The physician has an ethical obligation to help the patient make choices from among the therapeutic alternatives consistent with good medical practice. Informed consent is a basic social policy for which exceptions are permitted (1) where the patient is unconscious or otherwise incapable of consenting and harm from failure to treat is imminent; or (2) when risk-disclosure poses such a serious psychological

threat of detriment to the patient as to be medically contraindicated. Social policy does not accept the paternalistic view that the physician may remain silent because divulgence might prompt the patient to forego needed therapy. Rational, informed patients should not be expected to act uniformly, even under similar circumstances, in agreeing to or refusing treatment.

■ We recognize this statement as a reasonable statement on the issue of informed consent. There is no need to change Indiana law on this issue. We therefore hold that, except in those cases where deviation from the standard of care is a matter commonly known by lay persons, expert medical testimony is necessary to establish whether a physician has or has not complied with the standard of a reasonably prudent physician.

■ In the present case we cannot say that the risk of the adherence of the cervix to the vaginal wall is a matter commonly known to lay persons. Therefore, the Culbertsons needed to provide expert medical testimony to refute the unanimous opinion issued by the medical review panel in order to present a material issue of fact as to what a reasonably prudent physician would have discussed concerning this proposed surgery. Without the presentation of such expert medical opinion, the trial court could only conclude that there was no genuine issue of material fact and that summary judgment should be entered for Dr. Mernitz.

We affirm the entry of summary judgment in this case.

SHEPARD, C.J., and GIVAN, J., concur.

DICKSON, J., dissents, with separate opinion in which DeBRULER, J., concurs.

DICKSON, Justice, dissenting.

Just last year, in *Matter of Lawrance* (1991), Ind., 579 N.E.2d 32, 38, this Court proclaimed:

Indiana's common law doctrine of informed consent recognizes the right of the patient "to intelligently reject or accept treatment." *Revord v. Russell* (1980), Ind.App., 401 N.E.2d 763, 767. Perhaps the strongest explanation of the basis of this rule is contained in *Payne v. Marion General Hospital* (1990), Ind. App., 549 N.E.2d 1043, 1046, *trans. denied:* "The patient's right of self-determination is the *sine qua non* of the physician's duty to obtain informed consent. As Justice (then Judge) Cardozo said: 'Every human being of adult years and sound mind has a right to determine what shall be done with his own body....' *Schloendorff v. Society of New York Hospital* (1914), 211 N.Y. 125, 129, 105 N.E. 92, 93."

Emphasizing respect for patient autonomy, we acknowledged that liberty interests protected in the Indiana Constitution and public policy values preserved in Indiana statutory and common law reflect "a commitment to patient self-determination."[1] *Id.* at 39. In seeming disregard of these fundamental principles, however, today's decision rejects the prudent patient standard in informed consent cases. It ignores "the basic human need of self-determination and individual autonomy" in deference to decision-making by physicians. *Id.*

The central concern of the majority appears to be whether a plaintiff should be permitted to establish an informed consent claim without presenting expert medical testimony. This issue should not blind the Court to the basic values articulated in *Lawrance.* Nor does the prudent patient standard eliminate the need for a plaintiff to present medical expertise.

The doctrine of informed consent is rooted in the belief, fundamental to American jurisprudence, that every human being of adult years and sound mind has a right to determine what shall be done with his own

1. Shortly after the publication of *Matter of Lawrance,* the Journal of the Indiana State Medical Association commented, "The justices of the Indiana Supreme Court are to be praised for their thoughtful and reasoned approach to a difficult issue." James J. Nocon, M.D., J.D., "Doctors, families and difficult decisions: the implications of the Lawrance case," 84 *Indiana Medicine* 808 (Nov.1991).

body. *Canterbury v. Spence* (D.C.Cir. 1972), 464 F.2d 772, 780 (citing W. Prosser, *Law of Torts* § 18 (3d ed. 1964); *Restatement of Torts* § 49 (1934)) *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518. It is "every man's right to forego treatment or even cure if it entails what *for him* are intolerable consequences or risks, however warped or perverted his sense of values may be in the eyes of the medical profession, or even of the community, so long as any distortion falls short of what the law regards as incompetency." *Bee v. Greaves* (10th Cir.1984), 744 F.2d 1387, 1392 (emphasis in original), citing 2 F. Harper & F. James, Jr., *The Law of Torts* 61 (1986 Supp.), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334. Thus, a physician is required to disclose to the patient the risks of the proposed treatment, the risks of alternate treatments available, and the risk attendant to no treatment at all. *LeBeuf v. Atkins* (1979), 22 Wash. App. 877, 594 P.2d 923, 927, *rev'd on other grounds,* 93 Wash.2d 34, 604 P.2d 1287. Only when equipped with this information can the patient meaningfully weigh these risks and decide what course of action is most appropriate. *See Bee,* 744 F.2d at 1392.

Informed consent is a requisite component of the doctor-patient relationship, attributable in part to the relative lack of parity in that relationship. The trusting patient, typically unlearned in medical science, is highly dependent upon the physician for the information relied upon during the decisional process, imposing upon the physician a unique disclosure obligation toward the patient. *Cobbs v. Grant* (1972), 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1.

> To the physician, whose training enables a self-satisfying evaluation, the answer may seem clear, but it is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie. To enable the patient to chart his course understandably, some familiarity with the therapeutic alternatives and their hazards becomes essential.

*Canterbury,* 464 F.2d at 781 (footnotes omitted).

Cases alleging a lack of informed consent commonly arise in two situations: 1) a physician fails to fulfill the duty to inform the patient of the risks of proposed treatment or 2) a physician administers treatment beyond that authorized by the patient. *Rumple v. Bloomington Hosp.* (1981), Ind.App., 422 N.E.2d 1309, 1312. The critical issue in both scenarios is whether the patient was subjected to inherent risks of proposed treatment without being permitted to intelligently reject or accept treatment. *Kerr v. Carlos* (1991), Ind.App., 582 N.E.2d 860, 864.

Although there is widespread acceptance of the doctrine of informed consent as a theory of liability, there is disagreement concerning the role of expert medical witnesses in determining whether the informed consent of the patient has been obtained. Those invoking the "prudent patient" standard assess the adequacy of the disclosure by requiring mention of all inherent risks which a reasonably prudent patient would consider material in deciding to undergo or forego a particular procedure. While medical expertise would be required to identify the risks of proposed treatment and non-treatment, the fact finder needs no expert guidance to determine the materiality of a particular risk to a patient. *Canterbury,* 464 F.2d at 787. The "prudent physician" standard, on the other hand, evaluates the adequacy of the risk disclosure only from the physician's viewpoint. *Canterbury,* 464 F.2d at 783.

Central to the prudent patient standard is the inclusion of the word "material" to describe the risks of which a patient should be informed. A risk is material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether to forego the proposed procedure. *Canterbury,* 464 F.2d at 787.

> It seems obviously prohibitive and unrealistic to expect physicians to discuss with their patients every risk of proposed treatment—no matter how small or remote—and generally unnecessary from the patient's viewpoint as well.... In

our view, the patient's right of self-decision shapes the boundaries of the duty to reveal. That right can be effectively exercised only if the patient possesses enough information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is the information *material to the decision.*

*Id.* at 786 (emphasis added) (footnotes omitted).

Expressing a preference for the prudent physician standard, the majority claims support in a statement[2] published by the American Medical Association that acknowledges a patient's right of self-decision and the concomitant need for information adequate for intelligent decision-making. Yet the AMA "standard" cited by the majority fails to articulate parameters useful to physicians in determining the extent to which risks must be disclosed to a patient. This failure to establish medical criteria is understandable because the extent of disclosure is essentially a non-medical determination. It is only from the perspective of the ordinary person that a factfinder can realistically determines how much information is "enough" for the ordinary reasonable patient to make an informed decision. As expressed in *Canterbury:*

Respect for the patient's right of self-determination on particular therapy demands a standard set by law *for physicians* rather than one which physicians may or may not impose *upon themselves.*

*Canterbury,* 464 F.2d at 784 (emphasis added). Similarly, the court in *Cobbs* emphasizes:

Unlimited discretion in the physician is irreconcilable with the basic right of the patient to make the ultimate informed decision regarding the course of treat-

ment to which he knowledgeably consents to be subjected.

*Cobbs,* 104 Cal.Rptr. at 514, 502 P.2d at 10.

We further observe that the adoption of a physician-based standard and its deference to the medical profession may invite the possibility of unintentional bias, protective self-interest, or worse. *See, e.g., Moore v. Regents of the Univ. of Cal.* (1990), 51 Cal.3d 120, 271 Cal.Rptr. 146, 793 P.2d 479 (concealed self-interest of physician deriving commercial benefit from patient's spleen cells); *Mink v. University of Chicago* (N.D.Ill.1978), 460 F.Supp. 713 (concealed fact of medical experiment); *see generally* Theodore J. Schneyer, *Informed Consent and the Danger of Bias in the Formation of Medical Disclosure Practices,* Wis.L.Rev. 124 (1976); Note, *Restructuring Informed Consent: Legal Therapy for the Doctor–Patient Relationship,* 79 Yale L.J. 1533 (1970).

The majority expresses concern that the prudent patient standard would onerously require a physician to speculate as to what a hypothetical reasonable prudent patient would "need to know." Sympathy for such a physician plight, however, is eclipsed by the fundamental value of patient autonomy and self-determination.

The prudent patient standard does not eliminate the need for a plaintiff to present expert medical evidence to establish a claim based upon the theory of informed consent. Expert testimony is ordinarily required to establish the nature of the risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, the nature of available alternatives to treatment, and whether or not disclosure would be detrimental to a patient. *See Sard v. Hardy* (1977), 281 Md. 432, 379 A.2d 1014. Expert opinion is also generally necessary to establish the claimed injury proximately resulted from the non-disclosed risk. *Kerr,* 582 N.E.2d at 864.

Those elements which are the province of the medical profession must be estab-

---

**2.** The cited statement is entitled "1992 Code of Medical Ethics Current Opinions," and its preface states that the "opinions which follow are intended as guides to responsible professional behavior, but they are not presented as the sole or only route to medical morality." Preface, p. vii. As such, these opinions are aspirational rather than prescriptive.

lished by the testimony of medical experts in the field of inquiry. Thus, the existence of the risks and alternatives which were present in the particular physical condition would be beyond the knowledge of the layman and would have to be established by medical testimony. On the other hand, those matters which are not within the special province of the training and experience of doctors may be established by the testimony of any witness with knowledge of the particular inquiry, such as whether the patient knew of the risk or whether the average patient would consider the risk in making a decision. There is no need to prove what other doctors might tell their patients in similar circumstances. The doctor has a duty to disclose the material risks as a matter of law. The testimony of medical experts is not necessary to establish the duty to disclose that which the law requires. Once the existence of a risk has been established by expert medical testimony, there is no need to take the next step and also prove by expert medical testimony that the doctor should have told the patient about the risk. Once it has been established by expert medical testimony that a risk existed, then the existence of the risk is the patients' business; and it is not for the medical profession to establish a criteria for the dissemination of information to the patient based upon what the doctors feel the patient should be told.

*LeBeuf,* 594 P.2d at 928 (citations omitted).

Contrary to the view expressed by the majority, there is substantial and growing recognition of the wisdom of the prudent patient standard expressed in *Canterbury* and *Cobbs* and their progeny. Some 22 jurisdictions now favor this patient or materiality-based standard.[3] We should follow the lead of our Court of Appeals in this case and in *Griffith v. Jones,* (1991), Ind. App., 577 N.E.2d 258, and do likewise. This Court should declare the prudent patient standard applicable in informed consent cases.

DeBRULER, J., concurs.

**3.** *E.g., Fain v. Smith* (1985), Ala., 479 So.2d 1150; *Pedersen v. Zielski* (1992), Alaska, 822 P.2d 903; *McKinney v. Nash* (1981), 120 Cal. App.3d 428, 174 Cal.Rptr. 642; *Lambert v. Stovell* (1987), 205 Conn. 1, 529 A.2d 710; *Gordon v. Neviaser* (1984), D.C., 478 A.2d 292; *Griffith v. Jones* (1991), Ind.App., 577 N.E.2d 258; *Pauscher v. Iowa Methodist Medical Ctr.* (1987), Iowa, 408 N.W.2d 355; *Hondroulis v. Schuhmacher* (1988), La., 553 So.2d 398; *Zeller v. Greater Baltimore Medical Ctr.* (1986), 67 Md.App. 75, 506 A.2d 646; *Halley v. Birbiglia* (1983), 390 Mass. 540, 458 N.E.2d 710; *Plutshack v. University of Minnesota Hospitals* (1982), Minn. 316 N.W.2d 1; *Largey v. Rothman* (1988), 110 N.J. 204, 540 A.2d 504; *Congrove v. Holmes* (1973), 37 Ohio Misc. 95, 66 O.O.2d 295, 308 N.E.2d 765; *Scott v. Bradford* (1979), Okla., 606 P.2d 554; *Zacher v. Petty* (1992), 312 Or. 590, 826 P.2d 619 (statutory obligation agrees with prior common law); *Moure v. Raeuchle* (1992), 529 Pa. 394, 604 A.2d 1003; *Dewes v. Indian Health Serv.* (D.S.D., 1980), 504 F.Supp. 203; *Barklay v. Campbell* (1986), Tex., 704 S.W.2d 8; *Nixdorf v. Hicken* (1980), Utah, 612 P.2d 348; *Bertsch v. Brewer* (1982), 97 Wash.2d 83, 640 P.2d 711; *Cross v. Trapp* (1982), 170 W.Va. 459, 294 S.E.2d 446; *Keogan v. Holy Family Hosp.* (1980), 95 Wash.2d 306, 622 P.2d 1246; *see* annotation, *Modern Status as to General Measure of Physician's Duty to Inform Patient of Risks of Proposed Treatment,* 88 A.L.R.3d 1008.