

**FILED**

Nov 17 2017, 9:10 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Thomas L. Kirsch
Thomas L. Kirsch & Associates, P.C.
Munster, Indiana

ATTORNEY FOR APPELLEE,
MICHAEL P. HU, MD

Jeremy W. Willett
Michael E. O'Neill
O'Neill McFadden & Willett, LLP
Schererville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Francisco Perez, Jr.,
Individually, and by Laura
Aguirre his natural guardian and
next friend, and Laura Aguirre,
Individually,

*Appellants-Plaintiffs,*

v.

Michael P. Hu, M.D., and St.
Catherine Hospital of East
Chicago Indiana, Inc., an
Indiana Not-for-Profit
Corporation,

*Appellees-Defendants.*

November 17, 2017

Court of Appeals Case No.
45A04-1701-CT-113

Appeal from the Lake Superior
Court

The Honorable Thomas Webber,
Sr., Judge

Trial Court Cause No.
45D10-1409-CT-185

**Barnes, Judge.**

# Case Summary

Laura Aguirre, on behalf of her son Francisco Perez, Jr., appeals the trial court's grant of a directed verdict in favor of Dr. Michael Hu. We reverse and remand.

# Issue

The restated issue before us is whether the trial court properly granted directed verdict in Dr. Hu's favor on the issue of whether Aguirre gave informed consent to give birth to Francisco vaginally rather than by caesarean section ("c-section").

# Facts

We present the evidence in a light most favorable to Francisco and Aguirre, in accordance with the standard of review for a directed verdict. Francisco is Aguirre's fourth child. Her previous three children all were born vaginally without complications, including her last child, who weighed over ten pounds.

In early December 2009, Aguirre became the patient of Dr. Hu, an obstetrician-gynecologist ("OB-GYN"). Aguirre was seven months pregnant with Francisco at the time; her previous OB-GYN had moved her practice, and Dr. Hu took over Aguirre's care. Aguirre was diagnosed with gestational diabetes and was treated for it. Gestational diabetes increases the risk of having a significantly larger than average, or macrosomic, baby. The combination of gestational diabetes and a macrosomic baby significantly increases the risk of shoulder dystocia during a vaginal birth. Shoulder dystocia occurs when the baby's head

exits the birth canal but one of the shoulders remains stuck behind the mother's pubic bone, necessitating additional efforts by the doctor to complete the birth. Shoulder dystocia may result in brachial plexus injury to the baby, which is nerve damage that can cause permanent paralysis or palsy to the affected limb. Such injury may occur as the result of the doctor having to use additional traction on the baby to resolve the shoulder dystocia. A pregnant mother's obesity also may increase the risk of shoulder dystocia during vaginal birth; Aguirre qualified as obese during her pregnancy. A c-section substantially reduces the risk of shoulder dystocia during birth.

Aguirre, who has an elementary school education and does not speak English, does not recall Dr. Hu ever discussing the increased risk of harm to her baby during a vaginal birth as opposed to a c-section.[1] Rather, according to Aguirre, when she specifically asked Dr. Hu about the size of her baby and whether she would need a c-section, Dr. Hu said everything was fine and that she would not need one. She later testified, through an interpreter, "I told him that if [sic] everything was fine or if I was going to have operation. But he said that everything was fine. . . . He didn't say anything about surgery." Tr. Vol. II pp. 69-71. Dr. Hu recalled that he did discuss with Aguirre the risks and benefits of vaginal birth versus c-section but recommended vaginal birth to her. Dr. Hu

---

[1] An interpreter was present during Aguirre's prenatal appointments with Dr. Hu.

claimed to have documented this discussion with Aguirre in her medical chart, but any such documentation is missing from the chart.[2]

[6] On February 7, 2010, Aguirre went to the hospital for induction of labor, using the drug Pitocin to do so. The use of Pitocin to induce labor is an additional risk factor for shoulder dystocia during birth. Prior to her labor being induced, Aguirre signed a consent to treatment form, specifying that she was consenting to a vaginal delivery. Although Aguirre could not read the form because it was in English, it was translated for her by a phone translation service. The form stated in part:

> I understand this authorization and the reason why the operation is necessary, the possible complications and risk involved, the possible alternative approach(es) to this surgical method, and I acknowledge that no guarantee or assurance has been made as to results or cure. . . .
>
> Possible complications have been explained to me by my physician. I understand the material risks of this procedure. I also understand this is not intended to be an all inclusive list of possible complications associated with this procedure, and although less likely, other unforeseen complications may occur. I understand that medicine is not an exact science and that no guarantees can be made as to the outcome of this surgery.

---

[2] There is a notation in Aguirre's chart from an appointment with Dr. Hu on December 10, 2009, stating, "Multiple options discussed with patient. Patient to consider." Tr. Vol. III p. 112. This notation alone does not establish that Dr. Hu discussed with Aguirre the relative risks and benefits of a vaginal delivery versus c-section, as opposed to other matters related to Aguirre's prenatal care.

Ex. 3 p. 7.

[7] On February 8, 2010, Aguirre gave birth to Francisco. During the delivery, shoulder dystocia occurred. Dr. Hu had to apply additional pressure to Francisco's head to deliver him. Francisco weighed eleven-and-a-half pounds and had to be placed in the neonatal intensive care unit of a different hospital for ten days. The shoulder dystocia resulted in brachial plexus injury to Francisco's left arm. Francisco underwent two operations to attempt to correct that injury, but they were unsuccessful and he is unable to use that arm.

[8] On February 2, 2012, Francisco and Aguirre filed a proposed medical malpractice complaint with the Indiana Department of Insurance against Dr. Hu and the hospital where Francisco was born. The proposed complaint alleged negligence by Dr. Hu and the hospital in Aguirre's prenatal care and the delivery of Francisco. It also alleged that Dr. Hu failed to provide sufficient information to Aguirre to have allowed her to give informed consent to vaginal delivery versus a c-section. On July 16, 2014, a medical review panel unanimously opined that the evidence did not establish that Dr. Hu "failed to meet the applicable standard of care as charged in the complaint." Appellee's App. p. 37.

[9] On September 12, 2014, Francisco and Aguirre filed a complaint against Dr. Hu and the hospital, largely mirroring their proposed complaint. A jury trial was held on October 31, 2016, to November 4, 2016. During trial, Aguirre presented the expert testimony of Dr. Bruce Halbridge; Dr. Halbridge is a long-

time practicing OB-GYN and also currently a clinical instructor at the University of Texas-San Antonio medical school. He testified that he has delivered approximately 10,000 babies, that approximately 600 deliveries involved shoulder dystocia, but that none of those babies had brachial plexus injury. He stated that Aguirre had several risk factors associated with a significant increase in shoulder dystocia, including maternal obesity, gestational diabetes, a macrosomic fetus, and the induction of labor using Pitocin. Dr. Halbridge also explained that, if a mother is a diabetic, there is a three percent chance of shoulder dystocia during delivery; but, if a mother is diabetic and is giving birth to a macrosomic baby weighing more than ten pounds, the risk of shoulder dystocia increases to ninety-five percent.[3]

[10] Dr. Halbridge went on to testify that, given Aguirre's risk factors, Dr. Hu should have advised her of the risk of shoulder dystocia and resulting brachial plexus injury occurring during vaginal birth and the reduced risk of such injury during a c-section. As he explained:

> He could have told the patient that you've got this big baby, you've had uncontrolled diabetes, you have all these risk factors, and then explain what a shoulder dystocia is and what happens if the baby is born and the brachial plexus is injured, that it's a permanent injury. And he could have recommended, and should have recommended, a c-section delivery. Because if you get a shoulder dystocia during a c-section, you can actually cut more

---

[3] In his testimony, Dr. Hu agreed that the combination of maternal diabetes and a macrosomic baby increases the risk of shoulder dystocia by at least thirty-one percent, which number increases if the baby weighs more than ten pounds.

room.  You can make the opening in the uterus bigger and get the baby out easily.  So, it's not as dangerous as a shoulder dystocia vaginally, where you can't cut the bone and make more room at the top of the womb.

Tr. Vol. II p. 156.  He further stated that there was no indication in Aguirre's medical chart that Dr. Hu ever had such a discussion with Aguirre.  Dr. Halbridge did not specifically testify about the general risks of a c-section versus vaginal delivery.[4]  He did testify as follows:

> Q:  In your experience, when you tell a mother that there's a one percent chance in your personal experience, if you tell your mother there's a one percent chance of her baby having a serious injury if you proceed one way or the other way, what does the mother tell you?
>
> A:  Mother will become fearful and the mother will choose the method eliminates [sic] the risk, even if it's just one percent.

Tr. Vol. III p. 149.  Additionally, Aguirre testified that, if she had known the risk of injury to her baby by vaginal delivery, she would have chosen to have a c-section.

[11]  After Aguirre's presentation of evidence, the hospital moved for directed verdict in its favor, which the trial court granted.  Aguirre does not appeal that ruling.  Also, Dr. Hu moved for a partial directed verdict, only as to the informed

---

[4] Dr. Hu testified that there is a thirteen times greater risk of maternal death following a c-section and a fifteen times greater risk of infection, and also that there is an increased risk of fetal death, to an unspecified degree, due to respiratory distress.

consent issue. The trial court took this matter under advisement but granted it after Dr. Hu's presentation of evidence. The jury then returned a verdict in Dr. Hu's favor on the remaining negligence claim against him. Aguirre now appeals the directed verdict in favor of Dr. Hu.

## Analysis

[12] Motions for directed verdict, also called motions for judgment on the evidence, are controlled by Indiana Trial Rule 50(A). *Think Tank Software Dev. Corp. v. Chester, Inc.*, 30 N.E.3d 738, 744 n.4 (Ind. Ct. App. 2015), *trans. denied*. That rule provides in part:

> Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

A directed verdict is proper only if all or some of the issues are not supported by sufficient evidence. *Think Tank*, 30 N.E.3d at 744. "We will examine only the evidence and the reasonable inferences that may be drawn therefrom that are most favorable to the nonmovant, and the motion should be granted only where there is no substantial evidence supporting an essential issue in the case." *Id.* A directed verdict or judgment on the evidence is improper if there is evidence that would allow reasonable people to differ as to the result. *Id.*

[13] The law in Indiana regarding informed consent is not entirely clear. What is clear is that "physicians have a duty to disclose to their patients information material to a proposed course of treatment." *Spar v. Cha*, 907 N.E.2d 974, 984 (Ind. 2009) (citing *Bader v. Johnson*, 732 N.E.2d 1212, 1217 (Ind. 2000)). "Lack of informed consent" is a theory of liability that is distinct from a medical malpractice claim that a doctor provided treatment that negligently failed to meet the requisite standard of care. *Id.* at 979. Lack of informed consent is viewed as a battery claim if there is an alleged complete lack of consent to medical treatment, but otherwise it is "regarded as a specific form of negligence for breach of the required standard of professional conduct." *Id.* Aguirre's lack of informed consent claim clearly is of the second type.

[14] What is less clear is precisely what the elements of an informed consent claim are, and to what extent expert testimony is required to prove such a claim. Twenty-five years ago, our supreme court decided *Culbertson v. Mernitz*, 602 N.E.2d 98 (Ind. 1992). In a 3-2 decision, the court addressed whether a "reasonably prudent physician" or "reasonably prudent patient" standard is controlling in informed consent cases and whether expert testimony is required to prove an informed consent claim. The majority stated:

> Resolution of the issue of the necessity of expert medical testimony in informed consent cases depends on whether the issue is viewed through the eyes of the physician or the patient. When viewed through the eyes of the physician, it is easy to see that a physician should not be required to guess or speculate as to what a hypothetical "reasonably prudent patient" would "need to know" in order to make a determination. A physician should

only be required to do that which he is trained to do, namely, conduct himself as a reasonably prudent physician in taking a history, performing a physical examination, ordering appropriate tests, reaching a diagnosis, prescribing a course of treatment, and in discussing with the patient the medical facts of the proposed procedure, including the risks inherent in either accepting or rejecting the proposed course of treatment. From a physician's viewpoint, he should not be called upon to be a "mind reader" with the ability to peer into the brain of a prudent patient to determine what such patient "needs to know," but should simply be called upon to discuss medical facts and recommendations with the patient as a reasonably prudent physician would.

*Culbertson*, 602 N.E.2d at 103. Ultimately, the majority concluded, "except in those cases where deviation from the standard of care is a matter commonly known by lay persons, expert medical testimony is necessary to establish whether a physician has or has not complied with the standard of a reasonably prudent physician." *Id.* at 104. The majority did not explicitly adopt a set of elements needed to prove an informed consent claim.

[15] The lengthy dissent began by citing a decision by that court in the previous year in *Matter of Lawrance*, 579 N.E.2d 32, 39 (Ind. 1991). The dissent stated:

Emphasizing respect for patient autonomy, we acknowledged that liberty interests protected in the Indiana Constitution and public policy values preserved in Indiana statutory and common law reflect "a commitment to patient self-determination." In seeming disregard of these fundamental principles, however, today's decision rejects the prudent patient standard in informed consent cases. It ignores "the basic human need of self-determination and individual autonomy" in deference to decision-making by physicians.

The central concern of the majority appears to be whether a plaintiff should be permitted to establish an informed consent claim without presenting expert medical testimony. This issue should not blind the Court to the basic values articulated in *Lawrance*. Nor does the prudent patient standard eliminate the need for a plaintiff to present medical expertise.

*Culbertson*, 602 N.E.2d at 104 (Dickson & DeBruler, JJ, dissenting). The dissent also observed:

Although there is widespread acceptance of the doctrine of informed consent as a theory of liability, there is disagreement concerning the role of expert medical witnesses in determining whether the informed consent of the patient has been obtained. Those invoking the "prudent patient" standard assess the adequacy of the disclosure by requiring mention of all inherent risks which a reasonably prudent patient would consider material in deciding to undergo or forego a particular procedure. While medical expertise would be required to identify the risks of proposed treatment and non-treatment, the fact finder needs no expert guidance to determine the materiality of a particular risk to a patient. The "prudent physician" standard, on the other hand, evaluates the adequacy of the risk disclosure only from the physician's viewpoint.

*Id.* at 105. The majority did not respond directly to the dissent's arguments. Thus, it appeared after *Culbertson* that an informed consent claim rested entirely upon what a "reasonably prudent physician" would believe necessary to disclose, as proven by expert testimony, without reference to what a "reasonably prudent patient" would want to know.

[16] In later years, our supreme court has seemingly drifted away from the majority holding in *Culbertson* and toward the dissent's view, although it has never been overruled. In *Weinberg v. Bess*, 717 N.E.2d 584, 588 n.5 (Ind. 1999), the court stated, "Under the doctrine of informed consent, a physician must disclose the facts and risks of a treatment which a reasonably prudent physician would be expected to disclose under like circumstances, *and which a reasonable person would want to know*." (Emphasis added). For this proposition, the court cited a part of the *Culbertson* opinion that was discussing cases from other jurisdictions that had adopted the view that "a jury is in the best position to determine whether the physician gave the patient the information needed by the patient to weigh the alternatives and make the ultimate decision of whether to proceed with the proposed treatment." *Culbertson*, 602 N.E.2d at 100 (citing *Cobbs v. Grant*, 8 Cal.3d 229 (1972)). However, this was precisely the position the *Culbertson* majority seemed to end up rejecting and the dissent wanted to adopt. There is nothing in the *Culbertson* majority opinion indicating that "and which a reasonable person would want to know" is an element of an informed consent case in Indiana.

[17] Nevertheless, our supreme court subsequently cited the *Weinberg* footnote as a correct statement of the law of informed consent, in *Spar*, 907 N.E.2d at 984. The *Spar* opinion also adopted a five-element framework for informed consent claims, derived from a treatise on torts. Those elements, which a plaintiff must prove, are: (1) nondisclosure of required information; (2) actual damage; (3) resulting from the risks of which the patient was not informed; (4) cause in fact,

or proof that the plaintiff would have rejected the medical treatment if he or she had known of the risk; and (5) that reasonable persons, if properly informed, would have rejected the proposed treatment. *Id.* at 979-80.

[18] Assuming these are currently the five elements of an informed consent claim in Indiana, it seems clear that no expert testimony would be required with respect to whether a particular disclosure did or did not occur, nor as to whether the plaintiff herself would have chosen different treatment if she had known of the risk involved with the performed treatment. On the other hand, expert testimony generally is required to determine what a reasonably prudent physician should tell a patient before performing a medical procedure, unless the matter is within a layperson's understanding. *Bowman v. Beghin*, 713 N.E.2d 913, 916-17 (Ind. Ct. App. 1999).[5] Additionally, whether actual damage was caused as a result of an inadequate disclosure generally is a matter requiring expert opinion. *Bunch v. Tiwari*, 711 N.E.2d 844, 850 (Ind. Ct. App. 1999).

[19] In the present case, Dr. Halbridge's expert testimony clearly provided evidence, though disputed by Dr. Hu, that Aguirre's baby was at high risk of

---

[5] What a doctor must disclose to a patient also is enumerated by statute, and includes:

    (1) The general nature of the patient's condition.

    (2) The proposed treatment, procedure, examination, or test.

    (3) The expected outcome of the treatment, procedure, examination, or test.

    (4) The material risks of the treatment, procedure, examination, or test.

    (5) The reasonable alternatives to the treatment, procedure, examination, or test.

Ind. Code § 34-18-12-3.

encountering shoulder dystocia and resulting brachial plexus injury during a vaginal birth, that she should have been advised of that risk, and that she should have been advised that a c-section, while not eliminating the possibility of shoulder dystocia, would greatly reduce the risk of brachial plexus injury. Dr. Halbridge also believed Aguirre should have been expressly advised to have a c-section. Through a combination of Aguirre's lay testimony and Dr. Halbridge's expert review of her medical chart, there was evidence that Dr. Hu did not convey such information and advice to Aguirre. There was expert testimony by Dr. Halbridge that the decision to have a vaginal delivery rather than a c-section did, in fact, result in a difficult-to-resolve shoulder dystocia that left Francisco with brachial plexus injury and permanent, severe damage to his left arm. There was Aguirre's testimony that she would have elected to have a c-section rather than a vaginal delivery if she had known of the significant reduction of a risk of harm to her baby by having a c-section. This evidence satisfies the first four of the five *Spar* elements for an informed consent claim— evidence sufficient to defeat a motion for directed verdict.

[20] Here, the primary focus of the parties' dispute is whether Aguirre had to present expert testimony in support of the element that a properly-informed reasonable person would have rejected Dr. Hu's proposed treatment—i.e., whether an objectively reasonable person would have chosen to have a c-section rather than a vaginal delivery. There is currently no clear answer to that question. To require expert testimony in support of that element would seem consistent with the *Culbertson* majority's rejection of a "reasonable patient standard" for

informed consent claims and its requirement that an informed consent claim be proven by expert testimony. On the other hand, the very fact that our supreme court now has adopted the "reasonable patient" test as an element of an informed consent claim arguably indicates an implicit overruling of *Culbertson* and agreement with the dissent. In accordance with that view, expert testimony would be required as to some informed consent elements but not others. Namely, "[w]hile medical expertise would be required to identify the risks of proposed treatment and non-treatment, the fact finder needs no expert guidance to determine the materiality of a particular risk to a patient." *Culbertson*, 602 N.E.2d at 105 (Dickson & DeBruler, JJ, dissenting) (citing *Canterbury v. Spence*, 464 F.2d 772, 787 (D.C. Cir. 1972), *cert. denied*). Furthermore, as a matter of the meaning of a "reasonable person" standard in legal parlance, normally it is an objective standard measured by the collective judgment of a lay jury, not experts. *See Pierce v. Horvath*, 142 Ind. App. 278, 285, 233 N.E.2d 811, 815 (1968) (stating that the "reasonable man" standard "'is a personification of a community ideal of reasonable behavior, determined by the jury's social judgment.'") (quoting Prosser's Treatise on Torts, § 32 p. 154 (3rd ed. 1964)). Under this standard, it would be up to the jury to decide, based on its collective judgment and experience and not expert testimony, whether a reasonable

person would have chosen a different course of medical treatment if he or she had been adequately informed.[6]

[21] Regardless, even if we were to assume that Aguirre was required to present expert testimony that a "reasonable person" in Aguirre's situation would have chosen to have a c-section instead of a vaginal delivery if she had been properly informed, we believe Aguirre did so. We emphasize the following testimony by Dr. Halbridge:

> Q: In your experience, when you tell a mother that there's a one percent chance in your personal experience, if you tell your mother there's a one percent chance of her baby having a serious injury if you proceed one way or the other way, what does the mother tell you?
>
> A: Mother will become fearful and the mother will choose the method eliminates [sic] the risk, even if it's just one percent.

Tr. Vol. III p. 149. This expert testimony, based on years of experience and 10,000 deliveries, is evidence that a "reasonable" mother in Aguirre's position—faced with a risk of serious injury to her baby if there was a vaginal birth and a substantial reduction of that risk if there was a c-section—would have chosen to have a c-section. Certainly, it would be reasonable for a jury to draw such an inference. Dr. Hu writes off this testimony because it does not

---

[6] Such a standard would not require the jury to find that any and every person would have chosen a different course of treatment if adequately informed. As noted by the American Medical Association and quoted by the *Culbertson* majority, "Rational, informed patients should not be expected to act uniformly, even under similar circumstances, in agreeing to or refusing treatment." *Culbertson*, 602 N.E.2d at 104.

reflect the concomitant risks of a c-section that are greater than a vaginal delivery. That, however, goes to the weight of Dr. Halbridge's testimony, not its sufficiency as a matter of law. It would be reasonable for a jury to presume that Dr. Halbridge's recommendation of a c-section in situations such as Aguirre's, and mothers' election of that procedure, take into account the risks associated with a c-section.

[22]     We also acknowledge that Aguirre signed a consent-to-treatment form to have a vaginal delivery, after having the form translated to her. Indiana Code Section 34-18-12-2 provides:

> If a patient's written consent is:
>
>> (1) signed by the patient or the patient's authorized representative;
>>
>> (2) witnessed by an individual at least eighteen (18) years of age; and
>>
>> (3) explained, orally or in the written consent, to the patient or the patient's authorized representative before a treatment, procedure, examination, or test is undertaken;
>
> a rebuttable presumption is created that the consent is an informed consent.

In interpreting this statute, the Seventh Circuit has held that a rebuttable presumption arises under this statute only if a doctor has complied with the disclosure requirements of Indiana Code Section 34-18-12-3, including "[t]he

material risks of the treatment, procedure, examination, or test" and "[t]he reasonable alternatives to the treatment, procedure, examination, or test." *Lasley v. Moss*, 500 F.3d 586, 590 (7th Cir. 2007). As we have explained, there are disputed issues of fact here regarding whether Dr. Hu adequately explained the risks of a vaginal delivery by Aguirre and the reasonable alternative of having a c-section instead.

[23] Additionally, "[t]his chapter does not relieve a qualified health provider of the duty to obtain an informed consent." I.C. § 34-18-12-4. It makes little sense that Aguirre could be bound by a consent form stating that she had been told of "the possible complications and risk involved, the possible alternative approach(es) to this surgical method," and that she "understand[s] the material risks of this procedure" if she is able to prove that she was unaware of and not told of certain risks, possible complications, and an alternative treatment. In other words, even if a rebuttable presumption of informed consent arose here because of the consent form, Aguirre presented evidence that could have rebutted that presumption in the eyes of a jury.

## Conclusion

[24] Aguirre presented sufficient evidence that Dr. Hu did not convey adequate information to her regarding a significant risk of injury to her baby if she delivered vaginally rather than by c-section. Therefore, the trial court erroneously granted Dr. Hu's motion for directed verdict on the issue of informed consent. We reverse and remand for further proceedings on that issue.

May, J., and Bradford, J., concur.