FILED

Oct 10 2019, 6:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Michael G. Smith
Wooden McLaughlin LLP
Evansville, Indiana

ATTORNEY FOR APPELLEE

Eric A. Frey
Frey Law Firm
Terre Haute, Indiana

ATTORNEY FOR AMICUS
CURIAE INDIANA TRIAL
LAWYERS ASSOCIATION

Sara A. Langer
Langer and Langer
Valparaiso, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Christopher R. Glock, M.D., *Appellant-Defendant*, | October 10, 2019 |
| | Court of Appeals Case No. 18A-CT-2486 |
| v. | Appeal from the Vigo Superior Court |
| Rickey D. Kennedy, *Appellee-Plaintiff*. | The Honorable Lakshmi Reddy, Judge |
| | Trial Court Cause No. 84D02-1501-CT-382 |

**Brown, Judge.**

[1] Christopher R. Glock, M.D. ("Dr. Glock") appeals the trial court's denial of his motion for judgment on the evidence and motion to correct error. Dr. Glock raises several issues which we consolidate and restate as:

I. Whether the trial court abused its discretion in denying his motion for judgment on the evidence; and

II. Whether the court abused its discretion in denying his motion to correct error.

We affirm.[1]

## Facts and Procedural History

[2] This case arises from Dr. Glock's treatment of a crush injury to Rickey D. Kennedy's left hand, which he endured while at work in May 2010 and which resulted in burst lacerations to the index and middle fingers and in his middle finger "pointing in the wrong direction." Transcript Volume III at 33. Dr. Glock, whom Kennedy did not know and from whom he had no prior medical treatment, cleaned and debrided the injuries and fixed the middle finger with pins and the index finger with plate and screws.

[3] "[A]bout a year later" Dr. Glock amputated Kennedy's index finger from the tip to the first knuckle. Transcript Volume II at 160. He performed a repeat

---

[1] We heard effective oral argument in this case on September 25, 2019, in Indianapolis, and thank counsel for their oral advocacy and written presentations in this matter.

amputation which removed an infection and Kennedy's finger "[d]own to the nub," resulting in a "stump" near the knuckle nearest to his palm. *Id.* at 162.

[4] On October 3, 2011, Dr. Glock provided treatment (the "neuroma procedure") for a neuroma, or a "painful end" of a nerve that has been traumatized and is "swelling . . . in its response or attempt to heal." Transcript Volume III at 23-24. Following the procedure, Kennedy experienced pain in his thumb, called Dr. Glock's office "concerned that his thumb was still numb," and appeared for a post-operative visit "probably within a week" of the procedure. *Id.* at 50-51. On November 2, 2011, Dr. Glock performed a "repair of the ulnar digital nerve to the thumb with an autologous nerve graft from the radial digital nerve of the index finger." Exhibits Volume I at 58.

[5] On October 24, 2014, a medical review panel, which included Dr. Dale K. Dellacqua, issued an opinion after considering evidence Kennedy had submitted to the Indiana Department of Insurance against Dr. Glock. The opinion stated:

> The panel is of the unanimous opinion that the evidence does not support the conclusion that the defendant failed to meet the applicable standard of care, and that his conduct was not a factor of the resultant damages, but there is a material issue of fact, not requiring expert opinion, bearing on liability for consideration by the court or jury, with regard to the informed consent of the patient before the fourth surgery.

Exhibits Volume I at 4.

[6] In January 2015, Kennedy filed a Complaint For Medical Negligence, and in January 2016, Dr. Glock filed a motion for partial summary judgment. On

May 26, 2016, the parties tendered a proposed agreed order on the motion for partial summary judgment that identified the five surgeries, including Surgery Four as the neuroma procedure, and "would grant summary judgment" in favor Dr. Glock on all of Kennedy's claims "arising out of Surgery 1, Surgery 2, Surgery 3, and Surgery 5," and all claims "arising out of the Surgery 4, except for a claim of 'informed' consent with respect to that procedure, which the court granted on June 1, 2016." May 26, 2016 Proposed Agreed Order at 2.

[7] On June 26, 2018, the court held a jury trial. Kennedy's stepsister, Terri Lynn Coleman, testified that she accompanied him to the neuroma procedure and answered in the negative when asked if Dr. Glock had told Kennedy: "that surgery had a serious possibility of not being functional? Of not working," "there was going to be nerve injury, nerve damage," and that "there was any risk of nerve damage." Transcript Volume II at 138-139. She testified that she believed there was a time when Dr. Glock told Kennedy that he had cut the nerve and that she remembered "[t]hat it was an accident" and "they were going to do the fifth one to correct it." *Id.* at 139. She answered in the negative when asked if she ever heard Dr. Glock say that the proposed treatment might not alleviate all of Kennedy's pain that he experienced from the original injury. *Id.* at 140. She indicated that Kennedy told her that it hurt "[m]ainly in his thumb and his hand" "so bad that he can't stand it somedays." *Id.* at 142. When asked if Dr. Glock indicated "at any time during your conversation" that there might be a need for future procedures or surgery, she answered in the negative and stated "[i]t would fix everything." *Id.* at 143.

[8]     Kennedy testified that he lived with his mother, daughter, girlfriend, and her son and that he moved in about two-and-one-half to three years prior to help take care of his mother, who has been going blind, and his ill father. He indicated that he did not have a college education and, at the time of the accident, the nature of his work was physical labor. After describing how the crush injury occurred and the first two surgeries, he stated that after the first surgery there "was always something." *Id.* at 161. He answered affirmatively when he was asked if he had a conversation with Dr. Glock in his office about the neuroma procedure on September 28, 2011, and stated "Oh, it was going to get better" and "I mean it's gonna be good" when asked if Dr. Glock told him what would be the outcome of that surgery. *Id.* at 166. He answered in the negative when asked whether Dr. Glock ever told him that there was a likelihood that it would not work and whether he ever told him that there was a risk of further nerve injury. *Id.* He responded "No. Cause he's the one that cut it, so he was gonna fix it" when asked if Dr. Glock ever told him "the surgery in your palm was, there's a likelihood it wouldn't work." *Id.* He indicated that he would not have had the surgery if Dr. Glock had told him that he might die from it.

[9]     The court admitted diagrams of a hand as Plaintiff's Exhibits 4 and 5, and Records from the Terre Haute Regional Hospital as Defendant's Exhibits B and C and Plaintiff's Exhibits 2 and 3. Plaintiff's Exhibit 5 is a cross-section diagram labeling the arteries and nerves of the palm. Defendant's Exhibits B and C contain forms with Kennedy's signature that are titled "Consent for

Anesthesia," dated July 1, 2011 and October 3, 2011, and contain the statement that "rare, unexpected severe complications with anesthesia . . . include the remote possibility of *infection, bleeding, drug reactions, blood clots, loss of sensation, loss of limb function, paralysis, stroke, brain damage, heart attack, or death*." Exhibits Volume II at 90-91, 194-195. Both Plaintiff's Exhibits 2 and 3 include a form, which includes Kennedy and Dr. Glock's signatures beside a date of "9-28-11," is titled "Consent for Administration of Anesthesia and for Performance of Operations and Other Procedures," and which states in relevant part, "I, Rickey Kennedy . . . consent to and authorize the performance of the following treatment, procedure, examination or test: left index finger neuroma excision of radial digital nerve to palm by or under the direction of Christopher R. Glock."[2] Exhibits Volume I at 72, 131. The form also states:

B. Explanation

1. The general nature of my condition, the purpose, benefits and expected outcome of the Procedure, reasonable alternative methods of treatment along with their material risks, benefits and side effects, the possible outcome without the Procedure or alternative treatment, the Procedure or alternative treatment, and the possibility of complications have been fully explained to me by the Physician or an affiliated doctor ("Doctor"), and all of my questions have been answered. I acknowledge that no guarantees have been made to me concerning the results of the Procedure. I understand the nature of the Procedure to be (description of

---

[2] Both names and the phrase, "left index finger neuroma excision of radial digital nerve to palm," are written by hand onto the form. *See* Exhibits Volume I at 72, 131.

Procedure in layman's language): <u>Get pain out of hand by removing nerve from nub</u>.[3]

*Id.* Both Plaintiff's Exhibits 2 and 3 include a record from Terre Haute Regional Hospital that describes the neuroma procedure and which states that Kennedy was a patient with "left index finger neuroma pain at the stump" and who "had improvement on the ulnar side with persistence on the radial side,"[4] the "branches to the proper digital nerve to the index finger radial border and the common digital nerve to the second web space index and middle were identified each," the "common digital nerve to the second web space was preserved," the "flexor tendons to the index finger were assessed, and the proper digital nerve to the radial border of the index finger was identified," and that "[i]t was tensioned, and there was no corresponding tension in the thumb, only to the radial border of the stump." *Id.* at 66-67, 129-130.

[10] Plaintiff's Exhibit 2 includes a "History & Physical Report #24," which details a "followup for left index finger" after a "neuroma transposition" and states "Physical Exam (Christopher R Glock; 10/12/2011 8:39 AM)" and that Kennedy

> called postop, the day after, and stated that his thumb was very numb. I thought it was still the anethestic. He comes back today

---

[3] The phrase, "Get pain out of hand by removing nerve from nub," is written by hand onto the form. *See* Exhibits Volume I at 72, 131.

[4] In his testimony, Dr. Glock explained that "radial" means "away from the small finger" and "ulnar" means "on the small finger side." Transcript Volume III at 50.

for his normal followup and he states that it is still numb in the thumb. It looks like the whole thumb, radial and ulnar sides are numb.

PHYSICAL EXAMINATION: . . . He no longer has any pain at the index finger stump. He has numbness and tingling on the radial and ulnar borders of the left thumb . . . . At the time of surgery, the nerve was tested for its distribution and it seemed to be only coming from the area of the index finger stump, however, there can be branches from the stump to the thumb and so this needs to be evaluated surgically in my opinion.

*Id.* at 24. Both Plaintiff's Exhibits 2 and 3 include a record from Terre Haute Regional Hospital of the November 2, 2011 procedure that states, subsequent to the procedure, Kennedy "has had numbness on the ulnar side of the left thumb" and that it "was felt that he had a common digital nerve, which was previously suspected in the first web space between the index and thumb accounting for the numbness and thumb after division." *Id.* at 58, 133. Plaintiff's Exhibit 2 includes a "History & Physical Report #26," which details a "follow-up for [Kennedy's] left thumb and index finger" and states "Physical Exam (Christopher R Glock; 11/10/2011 2:18 PM)" and that

since I have last seen him, at the time of surgery, we found that he did have a common digital branch to the index finger and the ulnar side of thumb. This was branched after I already cut it from the previous procedure. . . . He is made aware that I did not do the test intraoperatively that I did on the procedure that originated in the cut of the nerve . . . . I explained to him that what we did at surgery, to reconstruct it.

*Id.* at 22.  Plaintiff's Exhibit 2 further includes a "History & Physical Report #31," which states "Physical Exam (Christopher R Glock; 1/16/2012 9:58 AM)," "since I have last seen him he is having difficulty when he uses his hand for heavy activity or touches it to the steering wheel right in this first web space," and "IMPRESSION: Left hand wound with revision amputation and neuroma transposition, and repair of iatrogenic nerve injury to the thumb."[5]  *Id.* at 17.

[11]  Kennedy testified about various records included in Plaintiff's Exhibits 2 and 3. He stated he had written the explanation for the neuroma procedure included on the form and indicated that it said "[g]et pain out of" "[h]and by removing nerve from nub," which correctly described his understanding of the operation. Transcript Volume II at 170.  He stated that Dr. Glock "did not tell me how he was gonna cut it" and indicated he had not explained "any risks to the nerves being close together."  *Id.* at 173.  When asked if he had pain in his thumb before the neuroma procedure, he answered in the negative and stated "[i]t had nothing to do with my thumb.  It was just these two fingers."  *Id.* at 174.  He indicated he did not have any other surgery on his thumb besides "the one that was done on the fifth surgery" subsequent to the neuroma procedure, and stated, "[i]n my thumb.  My thumb mostly," when asked about the location of the pain after the neuroma procedure.  *Id.*  He indicated that the pain did not "get out of [his] hand

---

[5] "Iatrogenic" is defined as "induced inadvertently by a physician or surgeon or by medical treatment or diagnostic procedures."  MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/iatrogenic (last visited September 30, 2019).  *See also* AMERICAN HERITAGE DICTIONARY 867 (4th ed. 2006) (defining "iatrogenic" as "[i]nduced in a patient by a physician's activity, manner, or therapy.  Used especially of an infection or other complication of treatment").

from removing the nerve to the nub" after the neuroma procedure and stated "[h]e just put it in another spot." *Id.* When asked when he first started having the "numbness [he] described and the sensation in [his] thumb," he responded "[t]he same surgery." *Id.* at 175. He testified that his writing on the diagram in Plaintiff's Exhibit 4 stated "Point where nerve was cut," that the diagram illustrated as best as he could recall "what Dr. Glock had told him about what happened in the surgery," and that Dr. Glock told him that "[h]e was gonna re-attach it to get the sensation, he was gonna fix what he done." *Id.* at 176. He further stated "You can feel it" when asked whether, as he sat there, he had pain in his thumb and testified that the problem with his thumb interferes with his work "[d]epend[ing] on what [he's] doing." *Id.* at 180.

[12] Kennedy presented and played for the jury the deposition of Dr. Dellacqua, a member of the medical review panel, who indicated that the neuroma procedure "was a resection of a neuroma." *Id.* at 242. When asked what risks the hand surgeon should tell the patient about before completing a neuroma resection, he stated that the "standard risk is nerve injury, infection, blood vessel injury, wound healing, and then obviously loss of life and limb. We don't always go into those. . . . But in a very general term, the gravity of surgery needs to be relayed to the patient." *Id.* at 244. When asked if there should be a discussion about reoccurrence, Dr. Dellacqua stated in part, "Nerves are a very fickle instrument. And just in my opinion, I have in my own hands gone back several times on nerves to try to get them to not stick to either skin or muscle or bone or become a problem in the hand. [T]he answer to your question is, reoccurrence of

the pain or lack of getting rid of the pain is, to me, the number one." *Id.* After the deposition concluded, the court took judicial notice without objection of the fact that the "life expectancy of a person . . . is thirty-seven point six years based upon the age that [Kennedy] was at the time this occurred" and the Social Security Administration actuarial table. Transcript Volume III at 7.

[13]    After Kennedy rested, Dr. Glock moved for judgment on the evidence. He argued that Kennedy "by his own testimony and by the evidence that [the court] received through those consents" was advised about "the risk that manifested itself and came about unintended nerve injury" as a risk prior to electing to complete the procedure and that there was "no evidence of medical causation between anything that happened in the fourth surgery and any injury which he claims he now has or has ever suffered." *Id.* at 8. After some argument, the court noted that it was a pretty low threshhold to overcome a motion for judgment on the evidence and denied Dr. Glock's motion. *Id.* at 16.

[14]    Dr. Glock then presented evidence on his behalf. He testified that, across the country in large populations of people who study it, seventy-five percent chance of success with a neuroma is what is quoted, and that "[s]uccess in this particular situation is improvement in pain" and "it's never complete elimination." *Id.* at 46. When asked if, by improvement, he meant "reduction in the level and intensity of the pain," he answered affirmatively and stated "To the point that the patient says, that was worth it. I'm glad I did it. That's the only hurdle. It's no more arduous than that. Does the patient think that it was worth it? And in these studies, roughly seventy-five percent (75%) did." *Id.* When asked if he told

Kennedy that he thought Kennedy's chance of success for the surgery as he had defined it was seventy-five percent, Dr. Glock answered, "I did." *Id.* When asked if he thought "it was reasonable for [Kennedy] to elect to have the surgery after the disclosures [he] made for it," he answered "Yes." *Id.*

[15] Dr. Glock indicated he "absolutely" recalled seeing Kennedy at the first post-operative visit for the neuroma procedure and that he had "independent recollection" of it. *Id.* at 51. He stated he was greatly concerned that Kennedy "said he had numbness here and here" and that he had "unusual variance, abnormal anatomy." *Id.* Dr. Glock testified he did exactly what he was trained to do with respect to that potential problem and that the test to identify normal anatomy did not work. He indicated that, at a meeting in his office, he explained to Kennedy what he "thought the cause was," that he "felt that the problem [Kennedy] was experiencing was as a result of my surgery," and that, when he cut a nerve that he "thought was an isolated nerve just going to the stump," he thought he "may have injured the nerve to [Kennedy's] thumb even though [he] checked for it." *Id.* at 54-55. During cross-examination, in response to being asked if the numbness and tingling to his thumb had not "gone away now, can we assume that it's permanent after this period of time," Dr. Glock stated "[s]adly." *Id.* at 61. He presented and played for the jury the deposition of Dr. Paul Perry, who indicated:

> So the ideal circumstance, since you know every – as we know
> that every cut nerve is going to make neuroma, every single one,
> we want to put the nerve – or put the neuroma where it will do
> that – cause the least amount of trouble. And so, when we talk

about moving neuromas, and the medical term for that is relocating, that the surgery that we do where we move that neuroma into a less conspicuous place, a less troublesome space. So that's what a neuroma relocation is or a removal of the neuroma. You're really not removing it; you're moving it.

*Id.* at 83. Kennedy testified as a rebuttal witness that Dr. Glock had not told him that the likelihood of success for the neuroma procedure was seventy-five percent and stated "[t]oday was the first time I heard that" when asked if Dr. Glock had given "any percentage at all of success." *Id.* at 123.

[16] At the close of evidence, the court heard argument regarding the final jury instructions. After deliberating for only an hour, the jury returned a verdict in favor of Kennedy in the amount of $2,300,000.[6] Kennedy's counsel indicated that the cap in this case was $1,250,000 and stipulated that Dr. Glock's liability "does not exceed Two Hundred and Fifty Thousand Dollars ($250,000.00) under the act." *Id.* at 170. The court allowed the record to reflect that Dr. Glock was a qualified provider, Kennedy's counsel agreed that judgment against him could not exceed $250,000, and the court entered judgment on July 6, 2018.

[17] Dr. Glock filed a motion to correct error, and the court issued a sixteen-page order denying the motion on October 5, 2018. The order noted in denying the "Motion to Correct Error based upon the issue of causation," that Dr. Glock

---

[6] The court's order on the motion to correct error indicates that the "jury began deliberating at 6:41 pm and the verdict was read into the record at 7:42 pm." Appellant's Appendix Volume II at 25.

testified that the fourth surgery he performed caused Kennedy's problems to his thumb area and "the jury appears to have relied on that testimony"; and, in denying the "Motion to Correct Error on the issue of informed consent," that whether "Kennedy met his burden of proof on the issue of informed consent depends on whether expert testimony is required for certain elements and whether the expert testimony can come from the defendant doctor" and that recent Indiana Court of Appeals caselaw "at least makes a suggestion that expert testimony is *not* required on the issue of what decision a reasonable properly informed patient would make." Appellant's Appendix Volume II at 13-14. In denying the "Motion to Correct Error on the basis that the jury verdict was excessive and outrageous," the court stated that it had a duty to review the entire evidence relevant to the issue of damages. *Id.* at 26. In reviewing that evidence, it made over eight pages of findings based on the testimony of Kennedy, Dr. Dellacqua, Dr. Glock, and Dr. Perry.

### Discussion

### I.

[18]     The first issue is whether the trial court abused its discretion by denying Dr. Glock's motion for judgment on the evidence. We note that Dr. Glock presented evidence after the court denied his motion and did not renew his motion at the close of the evidence. We therefore address Dr. Glock's argument as a sufficiency challenge. *See Bd. of Works of City of Lake Station v. I.A.E., Inc.*, 956 N.E.2d 86, 92 n.3 (Ind. Ct. App. 2011) (holding that the appeal of the denial of defendant's judgment on the evidence motion was waived by its

subsequent presentation of evidence and addressing its argument as a sufficiency challenge), *trans. denied*. In reviewing the sufficiency of evidence in a civil case, we will decide whether there is substantial evidence of probative value supporting the judgment. *Jamrosz v. Res. Benefits, Inc.*, 839 N.E.2d 746, 758 (Ind. Ct. App. 2005), *trans. denied*. We neither weigh the evidence nor judge the credibility of witnesses but consider only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. *See Davidson v. Bailey*, 826 N.E.2d 80, 87 (Ind. Ct. App. 2005) (quoting *Indian Trucking v. Harber*, 752 N.E.2d 168, 172 (Ind. Ct. App. 2001)). The verdict will be affirmed unless we conclude that it is against the great weight of the evidence. *Id.*

[19] Generally, in a medical malpractice action based on ordinary negligence, a plaintiff must establish (1) a duty on the part of the defendant physician in relation to the plaintiff, (2) failure of the physician to meet the requisite standard of care, and (3) an injury to the plaintiff resulting from that failure. *See Spar v. Cha*, 907 N.E.2d 974, 979 (Ind. 2009) (citing *Bader v. Johnson*, 732 N.E.2d 1212, 1216-1217 (Ind. 2000); *Oelling v. Rao*, 593 N.E.2d 189, 190 (Ind. 1992)). "'Lack of informed consent' is a theory of liability that is distinct from a medical malpractice claim that a doctor provided treatment that negligently failed to meet the requisite standard of care." *Perez v. Hu*, 87 N.E.3d 1130, 1135 (Ind Ct. App. 2017) (quoting *Spar*, 907 N.E.2d at 979). Lack of informed consent "is viewed as a battery claim if there is an alleged complete lack of consent to medical treatment, but otherwise it is 'regarded as a specific form of

negligence for breach of the required standard of professional conduct.'" *Id.* In light of the medical review panel's opinion and our review of the record, we conclude that Kennedy's lack of informed consent claim is of the second type.

[20] "To succeed on a lack of informed consent action, the plaintiff must prove '(1) nondisclosure of required information; (2) actual damage . . . (3) resulting from the risks of which the patient was not informed; (4) cause in fact, which is to say that the plaintiff would have rejected the medical treatment if she had known the risk; and (5) that reasonable persons, if properly informed, would have rejected the proposed treatment.'" *Spar*, 907 N.E.2d at 979-980 (quoting Dan B. Dobbs, *The Law of Torts*, § 250 (2001) (footnotes omitted)).

[21] Dr. Glock first contends that the trial court erred regarding the issue of causation and argues Kennedy presented no expert medical evidence, that "medical causation[] raises the bar and may only be determined by the expert testimony of a physician," and that Dr. Dellacqua did not provide expert testimony as to that issue. Appellant's Brief at 14. Kennedy maintains that Plaintiff's Exhibits 2 and 3 indicated that Dr. Glock admitted to him that "during the [neuroma procedure] he had tested to make sure that the nerve from the base of the stump did not have a branch to go to the thumb but that now he suspected that there was a branch which did so and he had severed that nerve" during the neuroma procedure. Appellee's Brief at 8. He argues that there is no reason to differentiate between or require evidence from the testimony of another expert medical witness "especially where the defendant physician has admitted that his surgery . . . caused the permanent injury" and

contends that Dr. Glock's testimony in direct and cross-examination provided undisputed evidence of causation from a medical expert. *Id.* at 20. The record reveals that Kennedy's witness, Dr. Dellacqua, who was a member of the medical review panel, testified in his deposition about the risks of the neuroma procedure. Based upon the evidence as set forth above and in the record, we find that substantial evidence of probative value supports the judgment and we cannot say that reversal is warranted on this basis.

[22] Dr. Glock further contends that no expert evidence demonstrated it was reasonable for Kennedy to refuse the neuroma procedure and Kennedy did not provide expert testimony which proved that, more likely than not, a reasonable person who was properly informed of the risks and complications of the neuroma procedure would have refused it. He argues that no medical evidence contradicted Dr. Perry's testimony, contends that this case is a perfect example of why the fifth element of an informed consent claim is required and "is particularly important where there is no evidence that actual care rendered fell below the standard of care," and asserts that the trial court should decide, in circumstances such as this one, the question as a matter of law. Appellant's Brief at 25. Kennedy responds that the issue was properly left to the jury and that the "reasonable patient is an adaptation of the reasonable man standard which we have employed as a community ideal of reasonable behavior to be determined by the jury's social judgment and not by expert opinion." Appellee's Brief at 26. The Indiana Trial Lawyers Association filed an amicus brief and argues that requiring expert testimony to show that a reasonable

person, if properly informed, would have rejected the proposed treatment runs afoul of public policy, is counter to the "most important and central goal of the informed consent doctrine[,] protect[ing] a patient's personal autmonomy," and "is essentially to say that people can control their bodies only to the extent that they are reasonable in the estimate of physicians." Amicus Brief at 13-14.

Jurors are free to draw inferences from the evidence presented. "[A]n inference is not disqualified simply because the subject of the inference is a matter of scientific knowledge." *City of Alexandria v. Allen*, 552 N.E.2d 488, 494 (Ind. Ct. App. 1990) (citing *Magazine v. Shull*, 60 N.E.2d 611 (Ind. Ct. App. 1945)), *reh'g denied*. "The evidence of an expert witness is to be received by the Court or jury trying the cause under the same rules and in the same manner that evidence of other witnesses is received and must be weighed by the trier of facts, the same as other evidence is weighed; the trier of facts is not bound by an expert's opinion." *Ferdinand Furniture Co., Inc. v. Anderson*, 399 N.E.2d 799, 807 (Ind. Ct. App 1980).

This Court recently held:

> Twenty-five years ago, our supreme court decided *Culbertson v. Mernitz*, 602 N.E.2d 98 (Ind. 1992). In a 3-2 decision, the court addressed whether a "reasonably prudent physician" or "reasonably prudent patient" standard is controlling in informed consent cases and whether expert testimony is required to prove an informed consent claim. The majority stated:
>
> > Resolution of the issue of the necessity of expert medical testimony in informed consent cases depends on whether the issue is viewed through the eyes of the physician or the

patient. When viewed through the eyes of the physician, it is easy to see that a physician should not be required to guess or speculate as to what a hypothetical "reasonably prudent patient" would "need to know" in order to make a determination. A physician should only be required to do that which he is trained to do, namely, conduct himself as a reasonably prudent physician in taking a history, performing a physical examination, ordering appropriate tests, reaching a diagnosis, prescribing a course of treatment, and in discussing with the patient the medical facts of the proposed procedure, including the risks inherent in either accepting or rejecting the proposed course of treatment. From a physician's viewpoint, he should not be called upon to be a "mind reader" with the ability to peer into the brain of a prudent patient to determine what such patient "needs to know," but should simply be called upon to discuss medical facts and recommendations with the patient as a reasonably prudent physician would.

*Culbertson*, 602 N.E.2d at 103. Ultimately, the majority concluded, "except in those cases where deviation from the standard of care is a matter commonly known by lay persons, expert medical testimony is necessary to establish whether a physician has or has not complied with the standard of a reasonably prudent physician." *Id.* at 104. The majority did not explicitly adopt a set of elements needed to prove an informed consent claim.

The lengthy dissent began by citing a decision by that court in the previous year in *Matter of Lawrance*, 579 N.E.2d 32, 39 (Ind. 1991). The dissent stated:

Emphasizing respect for patient autonomy, we acknowledged that liberty interests protected in the Indiana Constitution and public policy values preserved in Indiana statutory and common law reflect "a commitment to patient self-determination." In seeming disregard of

these fundamental principles, however, today's decision rejects the prudent patient standard in informed consent cases. It ignores "the basic human need of self-determination and individual autonomy" in deference to decision-making by physicians.

The central concern of the majority appears to be whether a plaintiff should be permitted to establish an informed consent claim without presenting expert medical testimony. This issue should not blind the Court to the basic values articulated in *Lawrance*. Nor does the prudent patient standard eliminate the need for a plaintiff to present medical expertise.

*Culbertson*, 602 N.E.2d at 104 (Dickson & DeBruler, JJ, dissenting). The dissent also observed:

Although there is widespread acceptance of the doctrine of informed consent as a theory of liability, there is disagreement concerning the role of expert medical witnesses in determining whether the informed consent of the patient has been obtained. Those invoking the "prudent patient" standard assess the adequacy of the disclosure by requiring mention of all inherent risks which a reasonably prudent patient would consider material in deciding to undergo or forego a particular procedure. While medical expertise would be required to identify the risks of proposed treatment and non-treatment, the fact finder needs no expert guidance to determine the materiality of a particular risk to a patient. The "prudent physician" standard, on the other hand, evaluates the adequacy of the risk disclosure only from the physician's viewpoint.

*Id.* at 105. The majority did not respond directly to the dissent's arguments. Thus, it appeared after *Culbertson* that an informed consent claim rested entirely upon what a "reasonably prudent physician" would believe necessary to disclose, as proven by

expert testimony, without reference to what a "reasonably prudent patient" would want to know.

In later years, our supreme court has seemingly drifted away from the majority holding in *Culbertson* and toward the dissent's view, although it has never been overruled. In *Weinberg v. Bess*, 717 N.E.2d 584, 588 n.5 (Ind. 1999), the court stated, "Under the doctrine of informed consent, a physician must disclose the facts and risks of a treatment which a reasonably prudent physician would be expected to disclose under like circumstances, *and which a reasonable person would want to know*." (Emphasis added). For this proposition, the court cited a part of the *Culbertson* opinion that was discussing cases from other jurisdictions that had adopted the view that "a jury is in the best position to determine whether the physician gave the patient the information needed by the patient to weigh the alternatives and make the ultimate decision of whether to proceed with the proposed treatment." *Culbertson*, 602 N.E.2d at 100 (citing *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972)). However, this was precisely the position the *Culbertson* majority seemed to end up rejecting and the dissent wanted to adopt. There is nothing in the *Culbertson* majority opinion indicating that "and which a reasonable person would want to know" is an element of an informed consent case in Indiana.

Nevertheless, our supreme court subsequently cited the *Weinberg* footnote as a correct statement of the law of informed consent, in *Spar*, 907 N.E.2d at 984.

*Perez*, 87 N.E.3d at 1135-36. In applying the *Spar* elements of an informed consent claim, we noted:

[I]t seems clear that no expert testimony would be required with respect to whether a particular disclosure did or did not occur, nor as to whether the plaintiff herself would have chosen different treatment if she had known of the risk involved with the

performed treatment. On the other hand, expert testimony generally is required to determine what a reasonably prudent physician should tell a patient before performing a medical procedure, unless the matter is within a layperson's understanding. *Bowman v. Beghin*, 713 N.E.2d 913, 916-17 (Ind. Ct. App. 1999). Additionally, whether actual damage was caused as a result of an inadequate disclosure generally is a matter requiring expert opinion. *Bunch v. Tiwari*, 711 N.E.2d 844, 850 (Ind. Ct. App. 1999).

* * * * *

Here, the primary focus of the parties' dispute is whether [the plaintiff] had to present expert testimony in support of the element that a properly-informed reasonable person would have rejected [the defendant physician's] proposed treatment – i.e., whether an objectively reasonable person would have chosen to have a c-section rather than a vaginal delivery. There is currently no clear answer to that question. To require expert testimony in support of that element would seem consistent with the *Culbertson* majority's rejection of a "reasonable patient standard" for informed consent claims and its requirement that an informed consent claim be proven by expert testimony. On the other hand, the very fact that our supreme court now has adopted the "reasonable patient" test as an element of an informed consent claim arguably indicates an implicit overruling of *Culbertson* and agreement with the dissent. In accordance with that view, expert testimony would be required as to some informed consent elements but not others. Namely, "[w]hile medical expertise would be required to identify the risks of proposed treatment and non-treatment, the fact finder needs no expert guidance to determine the materiality of a particular risk to a patient." *Culbertson*, 602 N.E.2d at 105 (Dickson & DeBruler, JJ, dissenting) (citing *Canterbury v. Spence*, 464 F.2d 772, 787 (D.C. Cir. 1972), *cert. denied*). Furthermore, as a matter of the meaning of a "reasonable person" standard in legal parlance, normally it is an objective standard measured by the collective judgment of a

lay jury, not experts. *See Pierce v. Horvath*, 142 Ind. App. 278, 285, 233 N.E.2d 811, 815 (1968) (stating that the "reasonable man" standard "'is a personification of a community ideal of reasonable behavior, determined by the jury's social judgment.'") (quoting Prosser's Treatise on Torts, § 32 p. 154 (3rd ed. 1964)). Under this standard, it would be up to the jury to decide, based on its collective judgment and experience and not expert testimony, whether a reasonable person would have chosen a different course of medical treatment if he or she had been adequately informed.

*Id.* at 1137-1138 (footnotes omitted).

[25] The record reveals that Kennedy submitted medical records from Terre Haute Regional Hospital describing the five procedures that occurred in 2010 and 2011, as well as reports on the follow-up exams conducted by Dr. Glock after the neuroma procedure and subsequent procedure in which Dr. Glock discovered a common digital branch to the index finger and the ulnar side of the thumb. Kennedy testified that he did not have pain in his thumb before the neuroma procedure and indicated that he had pain in his thumb at trial. The form dated prior to the neuroma procedure and signed by both Dr. Glock and Kennedy included Kennedy's statement "get pain out of hand by removing nerve from nub," which he testified correctly described his understanding of the operation at the time. Exhibits Volume I at 72. He further presented the deposition of Dr. Dellacqua, a member of the medical review panel, who stated that the standard risk of a neuroma resection was "nerve injury, infection, blood vessel injury, wound healing, and then obviously loss of life and limb" and "in a very general term, the gravity of surgery needs to be relayed to the patient."

Transcript Volume II at 244. He further testified that reoccurrence of the pain or lack of eliminating the pain is "number one" in a discussion on the risks of a neuroma procedure. *Id.* Dr. Perry stated that a removal of the neuroma is "really not removing it" but "moving it." Transcript Volume III at 83. Dr. Glock indicated that roughly seventy-five percent of people experienced a reduction in the level and intensity of pain to the point that the patient says "that was worth it," and he stated that success was "never complete elimination." *Id.*

[26] The reasonable inferences to be drawn from the expert testimony provided are that roughly twenty-five percent of people who undertake a neuroma procedure do not experience a reduction in the level and intensity of pain to the point that the patient says "that was worth it"; that the roughly seventy-five percent of people who do experience success do not have complete elimination of pain; and that a primary component of a discussion on the risks of a neuroma procedure includes discussing the reoccurrence of pain or the lack of eliminating the pain. We find under these circumstances that a finding that reasonable persons, if properly informed, would have rejected the proposed treatment is not against the great weight of the evidence and conclude that the evidence most favorable to the judgment along with all reasonable inferences to be drawn from the evidence supports the judgment with regard to this issue.

II.

The next issue is whether the trial court abused its discretion in denying Dr. Glock's motion to correct error on the basis that the jury verdict was excessive. He argues that the amount of damages awarded by the jury cannot be explained on any reasonable ground, contends that Kennedy did not have a substantial change in his quality of life or the amount of pain due to his alleged injuries arising from the neuroma procedure, and asserts that Kennedy provided neither evidence that his pre-existing pain was caused or enhanced after the neuroma procedure nor reasons for the jury to award him for the rest of his life more money daily than he makes in a day's work.

The record reveals that the jury's verdict in favor of Kennedy awarded him damages of $2,300,000, Kennedy's counsel indicated that the cap in this case was $1,250,000 and agreed that Dr. Glock's liability could not exceed $250,000, and the court took notice that Dr. Glock was a qualified provider. This Court has recently explained that:

> the remedy offered by Indiana Trial Rule 59(J)(5) is "available only where the evidence is insufficient to support the verdict as a matter of law." *Solnosky v. Goodwell*, 892 N.E.2d 174, 184 (Ind. Ct. App. 2008) (quoting *City of Carmel v. Leeper Elec. Servs., Inc.*, 805 N.E.2d 389, 392 (Ind. Ct. App. 2004), *trans. denied*). Once the trial court has entered final judgment on the evidence for the amount of proper damages, we will reverse the decision only for an abuse of discretion. *Id.*

> We afford a jury's damage award great deference on appeal. *Sims v. Pappas*, 73 N.E.3d 700, 709 (Ind. 2017). In considering whether a jury verdict is excessive, we do not reweigh the evidence and look only to the evidence and reasonable inferences that may be drawn therefrom that support

the verdict. *West v. J. Greg Allen Builder, Inc.*, 92 N.E.3d 634, 643 (Ind. Ct. App. 2017), *trans. denied* (2018). If there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed. *Sandberg Trucking, Inc. v. Johnson*, 76 N.E.3d 178, 189 (Ind. Ct. App. 2017). "To warrant reversal, the award must appear to be so outrageous as to impress the Court at first blush with its enormity." *Id.* (citation and quotation marks omitted). An award is not excessive unless the amount cannot be explained upon any basis other than prejudice, passion, partiality, corruption, or some other element of improper consideration. *Sims*, 73 N.E.3d at 709.

\* \* \* \* \*

"Awards for pain, suffering, fright, humiliation, and mental anguish are particularly within the province of the jury because they involve the weighing of evidence and credibility of witnesses." *Landis v. Landis*, 664 N.E.2d 754, 757 (Ind. Ct. App. 1996). Indeed, "[p]hysical and mental pain are, by their very nature, not readily susceptible to quantification, and therefore, the jury is given very wide latitude in determining these kinds of damages." *Groves v. First Nat'l Bank of Valparaiso*, 518 N.E.2d 819, 831 (Ind. Ct. App. 1988). "Our inability to actually look into the minds of jurors and determine how they computed an award is, to a large extent, the reason behind the rule that a verdict will be upheld if the award falls within the bounds of the evidence." *Griffin v. Acker*, 659 N.E.2d 659, 664 (Ind. Ct. App. 1995).

*Carney v. Patino*, 114 N.E.3d 20, 31 (Ind. Ct. App. 2018), *trans. denied*.

[29]  We observe that the trial court reviewed the testimony of Kennedy, Dr. Dellacqua, Dr. Glock, and Dr. Perry and that the findings in its order on this issue exceeded eight pages. The evidence reveals that Kennedy's remaining life

expectancy is 37.6 years based upon the age that he was at the time of the accident, that the location of the pain before the neuroma procedure "had nothing to do" with his thumb but rather two other fingers, that the pain after the neuroma procedure was located in his thumb mostly and is permanent, and that the problem with his thumb interferes with his work depending on the task. We further note Coleman's testimony that Kennedy has shared that the pain mainly in his thumb and hand "is so bad that he can't stand it somedays." Transcript Volume II at 142. Dr. Glock's arguments to the contrary are essentially a request for us to reweigh the evidence and reassess witness credibility, which we cannot do. *See West*, 92 N.E.3d at 643 (when party seeks to reverse adverse judgment on basis of insufficient evidence, appellate court will not weigh evidence or assess witness credibility). We cannot say that the court abused its discretion in denying the motion to correct error.

[30] For the foregoing reasons, we affirm the trial court's denial of the motion for judgment on the evidence and motion to correct error.

[31] Affirmed.

Baker, J., and Mathias, J., concur.